UNITED TECHNOLOGIES CORPORATION *v.*
TOWN OF EAST WINDSOR
(SC 16761)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued September 13—officially released November 5, 2002

*Gregory F. Servodidio*, with whom were *Julie A. Morgan* and, on the brief, *Elliott B. Pollack*, for the appellant (plaintiff).

*Frank W. Murphy*, with whom was *Kara T. Murphy*, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the trial court's conclusion about the subject property's highest and best use was improperly restrictive, forcing it to ignore relevant market data when valuing the property. The plaintiff, United Technologies Corporation,[1] brought this action against the defendant,

---

[1] The action was brought by the Hamilton Standard Division of United Technologies Corporation.

the town of East Windsor, pursuant to General Statutes § 12-117a,[2] appealing from the decision of the board of assessment appeals of the town of East Windsor (board)

[2] General Statutes § 12-117a provides: "Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment,

upholding the assessor's determination of the fair market value of the plaintiff's aftermarket support facility. The trial court determined that the plaintiff's property was not overassessed and dismissed the plaintiff's appeal. The plaintiff appealed from that judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The record reveals the following facts and procedural history relevant to the disposition of this appeal. The plaintiff is the lessee of improved real estate located at 97 Newberry Road in East Windsor. The plaintiff uses this property as an aftermarket support facility for the manufacturing, repairing, and reconditioning of jet engine fuel injectors and propellers for aircraft piston engines. The plaintiff also manufactures testing equipment and performs ancillary administrative tasks at the facility. The property is located in a primarily industrial area on the north side of Newberry Road in East Windsor, just east of Route 5. Route 5 is a commercial highway that provides ready access to Interstates 84 and 91, as well as nearby Bradley International Airport in Windsor Locks. Several other major corporations also have facilities in this area of East Windsor, which is zoned for light industrial use with a minimum lot size of 60,000 square feet.

As the trial court aptly stated, the plaintiff's property is "not the normal run-of-the-mill plant." It is a 278,025 square foot light industrial facility located on 39.41 acres of land with an on-site, tax-exempt wastewater

enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

treatment facility. The facility is a one-story building, 78.2 percent (217,455 square feet) of which is devoted to manufacturing, with the remaining 21.8 percent (60,570 square feet) allotted for office space. The structure also contains an 8000 square foot interior mezzanine. The ceiling height inside the building is fourteen feet in the offices and more than twenty-six feet in the manufacturing area. The facility includes environmentally controlled "clean rooms," blast-resistant doors, explosion-containing walls for a chemical storage area, a reinforced concrete floor designed for heavy loads, heating and air conditioning for the entire building, the highest quality plumbing infrastructure, floor drainage systems with emergency tanks to contain chemical spills, and full fire suppression capabilities, including sprinklers and a fire warden's station.

In June, 1987, the plaintiff entered into a fifteen year lease with Beckenstein Enterprises (Beckenstein). Under the terms of the lease, Beckenstein was to construct the facility in accordance with the plaintiff's plans and specifications. In November, 1987, Beckenstein completed the purchase of the necessary land on which the plaintiff's facility is located for $1,400,000, which is equal to $35,523 per acre. The construction was financed with funds provided by Prudential Insurance Company of America (Prudential).[3] Construction was completed in 1988, and the plaintiff took occupancy in 1989. The lease itself is a modified triple net lease under which the plaintiff is responsible for all operating expenses, including taxes. As lessor, Beckenstein, remains responsible for insurance and structural repairs.

---

[3] The premises, which are owned by Beckenstein, are subject to a nonrecourse mortgage with Prudential as the mortgagee, executed in September, 1994. The mortgage's principal amount is $26,000,000, which is secured solely by the property.

The initial rent under the lease for the first five years was based on the cost of construction, including change orders. Thereafter, the rent was adjustable for the balance of the lease period, depending on the mortgage to Prudential. In 1994, Beckenstein and the plaintiff executed the fifth amendment to the lease.[4] Under this amendment, the annual rent for each of the remaining ten years on the lease was $4,251,687. The amendment also provided the plaintiff with an option to purchase the property for $25,344,000 or a mutually agreed upon price at the termination of the lease, or, in the alternative, a right of first refusal.

On the list of October 1, 1995, John Valente, an independent appraiser hired by the town of East Windsor, assessed the property pursuant to General Statutes § 12-63b[5] and

[4] This amendment was executed in settlement of a dispute between Beckenstein and the plaintiff over earlier lease terms.

[5] General Statutes § 12-63b provides: "(a) The assessor or board of assessors in any town, when determining the present true and actual value of real property as provided in section 12-63, which property is used primarily for the purpose of producing rental income, exclusive of such property used solely for residential purposes, containing not more than six dwelling units and in which the owner resides, and with respect to which property there is insufficient data in such town based on current bona fide sales of comparable property which may be considered in determining such value, shall determine such value on the basis of an appraisal which shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property. The provisions of this section shall not be applicable with respect to any housing assisted by the federal or state government except any such housing for which the federal assistance directly related to rent for each unit in such housing is no less than the difference between the fair market rent for each such unit in the applicable area and the amount of rent payable by the tenant in each such unit, as determined under the federal program providing for such assistance.

"(b) For purposes of subdivision (3) of subsection (a) of this section and, generally, in its use as a factor in any appraisal with respect to real property used primarily for the purpose of producing rental income, the term 'market rent' means the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider

12-62a[6] and determined that the total fair market value[7] of the property was $22,236,770, with an assessed value of $15,565,740. Valente testified before the trial court that he used the cost approach[8] to appraise the property because he felt it was best adapted to "[deal] with [the] specific features or subtle characteristics of [the] property . . . ." He also performed an evaluation using the income capitalization approach,[9] but did not use the market sales approach[10] to determine a valuation because he concluded that there were no sales of properties comparable to the plaintiff's.

the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination."

[6] General Statutes § 12-62a (b) provides in relevant part: "Each . . . municipality shall assess all property for purposes of the local property tax at a uniform rate of seventy per cent of present true and actual value, as determined under section 12-63."

[7] This calculation included the fair market values of the land, buildings, on-site wastewater treatment facility, and outbuildings. The wastewater treatment facility is valued but not taxed.

[8] Under the cost approach to valuation, the appraiser estimates the current cost of replacing the subject property, with adjustments for depreciation, the value of the underlying land, and entrepreneurial profit. See J. Eaton, Real Estate Valuation in Litigation (2d Ed. 1995) p. 157.

[9] "The income capitalization approach is a procedure that appraisers use to develop an indication of market value by applying a rate or factor to the anticipated net income from a property." J. Eaton, Real Estate Valuation in Litigation (2d Ed. 1995) p. 194. Appraisers arrive at the anticipated net income by considering the property's actual rental income, as well as the rental income for comparable properties in the vicinity, property expenses, and allowances for vacancy and collection losses. Id.

Valente's income capitalization valuation used the discounted cash flow method that accommodates the risks of payment over time under long-term lease arrangements by considering each year's individual cash flows. It also requires a market analysis of comparable leases. Valente testified that he used the actual lease income negotiations between the plaintiff and Beckenstein as "comparable to market," because he found no comparable leases within the relevant market.

[10] The market sales approach is also known as the "sales comparison approach" or the "market data approach." J. Eaton, Real Estate Valuation in Litigation (2d Ed. 1995) pp. 197–98. Under the market sales approach, the subject property's appraised value is derived from a comparison to recently sold similar properties in the vicinity, with appropriate value adjustments "based on the elements of comparison." Id., p. 197.

The plaintiff appealed from Valente's determination to the board seeking a reduction of the assessment. The board did not reduce the property's assessed value. The plaintiff then appealed from the board's decision to the trial court.[11]

The trial court framed the primary issue as whether Valente's valuation of the property was excessive. The plaintiff and the defendant each presented the expert testimony and reports of two independent appraisers. Arnold J. Grant and William N. Kinnard testified for the plaintiff, and Christopher K. Kerin and Ronald B. Glendinning testified for the defendant. The defendant also presented testimony by Valente, who made the original assessment, and Joseph Gambino, a construction expert.

The starting point of the trial court's analysis of the town's valuation was a determination of the property's highest and best use[12] at the time of the assessment. The plaintiff's and the defendant's appraisers each testified to a highest and best use for the property. They then arrived at estimates of the property's fair market value, following the same basic analytical framework; see footnotes 8 through 10 of this opinion; but reaching ultimately divergent conclusions.

The plaintiff's experts, Grant and Kinnard, concluded in a joint report submitted into evidence that the fair market value of the property was $13,825,000. They arrived at that conclusion by valuing the property at

[11] The plaintiff subsequently filed amendments to the tax appeal in the month of October of 1996, 1997, 1998, 1999 and 2000, to revise the assessment lists to reflect the most current valuation.

[12] We previously have defined "highest and best use" as "the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." (Internal quotation marks omitted.) *Metropolitan District* v. *Burlington*, 241 Conn. 382, 390, 696 A.2d 969 (1997).

$13,825,000 under the market sales approach,[13] $13,800,000 under the income capitalization approach,[14] and $14,100,000 under the cost approach.[15] The plaintiff's experts ultimately adopted the value from the market sales approach as their conclusion because it was, in their view, the "preferred approach" when "sufficient numbers of comparable sales transactions data are available in appropriate quality and reliability."

The defendant's expert appraisers, Kerin and Glendinning, performed their valuation analysis using the same three approaches as the plaintiff's experts and concluded that the property had a fair market value of $25,800,000 on October 1, 1995. They did not utilize a market sales approach because, in their opinion, the plaintiff's facility is a "limited market" property with no comparable property sales at or near the valuation date. Kerin and Glendinning arrived at fair market values of $26,000,000 under the income capitalization approach,[16]

---

[13] Under their market sales approach, Grant and Kinnard analyzed nine sales of improved industrial properties in northern central Connecticut between January, 1992, and September, 1995. They then compared the properties to the plaintiff's property, using adjustment factors for differences in the date of sale (market), size, building age at date of sale, percentage of the building devoted to office space, vehicular access, ceiling height, and the ratio of land area to building area. Their comparable sales analysis showed the market value of the subject property to be $50 per square foot, which computed to a rounded figure of $13,825,000.

[14] Under their income capitalization approach, Grant and Kinnard analyzed eleven market rents from other industrial facilities in Connecticut that they considered comparable to the subject property. They elected not to consider the property's contract rent of $15.46 per square foot because, in their opinion, that figure was "dramatically above the upper limits to the range of reported rentals in the entire Greater Hartford Suburban Industrial Market Area, under market conditions as of the October 1, 1995 Valuation Date."

[15] Under their cost approach, Grant and Kinnard analyzed the value of the vacant land and then used data from the Marshall Valuation Service to compute the replacement cost of the building itself, ultimately arriving at an estimate of $14,100,000 after adjustment for depreciation.

[16] The income capitalization approach of Kerin and Glendinning used a discounted cash flow analysis to create a present value indication from the property's expected future income. The trial court noted that they considered

and $25,700,000 under the cost approach,[17] which they reconciled to their final estimate of $25,800,000.

The trial court adopted the opinion of the defendant's appraisers that a market sales approach was inapplicable in this case because there were no comparable sales. The court deemed the plaintiff's experts' opinion to the contrary as "not credible." The trial court also determined that the income capitalization analysis of Kerin and Glendinning was more credible, stating that "the rentals used by Grant and Kinnard involved properties with dissimilar sizes and uses to the subject property." Finally, the trial court found the use by Kerin and Glendinning of the historic construction costs, in addition to the Marshall Valuation Service data utilized by both sides in their cost approach analyses, to be a more credible way to determine value. See footnote 17 of this opinion.

The trial court concluded that the fair market value of the subject property on October 1, 1995, was

discounted cash flow analysis "most reflective of the valuation process a typical buyer utilizes when contemplating the purchase of an income-generating investment property." They determined that the contract rent was in line with the rent charged for what they deemed to be the only comparable property in Connecticut, namely, the Allied Signal facility in Cheshire. The trial court stated that it was particularly impressed with this approach because it reflected the " 'arms length' " bargaining that occurs between two knowledgeable and sophisticated parties, like the plaintiff and Beckenstein.

[17] The cost approach used by Kerin and Glendinning considered both the Marshall Valuation Service data and the actual historic cost of construction. The historic cost analysis used the actual cost of construction from 1988, obtained from the plaintiff's own data, and trended it forward to reflect a 1995 value. The historic cost analysis value differed from the estimate Kerin and Glendinning obtained using the Marshall Valuation Service by less than 1 percent. Kerin and Glendinning then added an estimate of entrepreneurial profit, 15 percent of total project cost, to the construction cost to reflect the benefits and profits to the plaintiff as a result of the facility's construction. After adjustment for depreciation, the value of the plaintiff's added improvements, and the value of the site itself, Kerin and Glendinning arrived at a rounded value of $25,700,000.

$22,636,600. The court arrived at that figure by using the cost analysis of Kerin and Glendinning, substituting its own finding of the vacant land value from Beckenstein's original purchase and omitting entrepreneurial profit.[18] The court then concluded that its fair market value of $22,636,600 was "compatible" with the town assessor's original appraisal of $22,236,770. Accordingly, the trial court dismissed the plaintiff's appeal after the five day trial, concluding that "[the plaintiff] has not met its burden of showing that the property was overvalued."

On appeal, the plaintiff claims that the trial court's conclusion as to the highest and best use was improperly restrictive because it failed to consider that the property could be put to other industrial uses, forcing the court to ignore relevant market data in contravention of General Statutes §§ 12-63[19] and 12-63b when valuing the property. See footnote 5 of this opinion for the text of § 12-63b. The plaintiff also claims that the trial court improperly admitted the defendant's appraisers' report as relevant evidence because it was based on an improperly restrictive highest and best use standard. The plaintiff further claims that the trial court improperly: (1) concluded that the report satisfies the standards for admissibility of expert testimony under § 7-2

[18] The trial court stated that, in its opinion, entrepreneurial profit was already incorporated into the rent and, therefore, did not need to be accounted for separately in valuing the property.

[19] General Statutes § 12-63 (a) provides: "The present true and actual value of land classified as farm land pursuant to section 12-107c, as forest land pursuant to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be if such open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. *The present true and actual value of all other property shall be deemed by all assessors and boards of assessment appeals to be the fair market value thereof and not its value at a forced or auction sale.*" (Emphasis added.)

of the Connecticut Code of Evidence, *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *State* v. *Porter*, 241 Conn. 57, 69, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); and (2) denied the plaintiff a meaningful opportunity to challenge the admissibility of that report. We disagree with the plaintiff's first two claims and conclude that the latter claims were not properly preserved for appellate review. Accordingly, we affirm the judgment of the trial court.

I

The plaintiff's principal claim is that the trial court, when determining the highest and best use of the property, arrived at an improperly restrictive conclusion because it failed to consider that the property could be put to other industrial uses, thereby forcing the trial court to ignore relevant market data in contravention of Connecticut law. We disagree.

A

Before discussing the plaintiff's specific highest and best use claim, we briefly explore the legal framework governing tax appeals taken pursuant to § 12-117a, as well as the applicable standard of review. In § 12-117a tax appeals, "the trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property." (Citations omitted; internal quotation marks omitted.) *Xerox Corp.* v. *Board of Tax Review*, 240 Conn. 192, 204, 690 A.2d 389 (1997); *Ireland* v. *Wethersfield*, 242 Conn. 550, 556, 698 A.2d 888 (1997); *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 104, 626 A.2d 1292 (1993); see *Burritt Mutual Savings Bank of New Britain* v. *New Britain*, 146 Conn.

669, 675, 154 A.2d 608 (1959). Once the taxpayer has demonstrated aggrievement by proving that its property was overassessed, "the trial court [will] then undertake a further inquiry to determine the amount of the reassessment that would be just." *Ireland* v. *Wethersfield,* supra, 558. "The trier of fact must arrive at [its] own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value . . . ." (Internal quotation marks omitted.) *Xerox Corp.* v. *Board of Tax Review,* supra, 204.

We review the trial court's conclusion in a tax appeal pursuant to the well established clearly erroneous standard of review. Under this deferential standard, "[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Internal quotation marks omitted.) *First Bethel Associates* v. *Bethel,* 231 Conn. 731, 744, 651 A.2d 1279 (1995). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Melillo* v. *New Haven,* 249 Conn. 138, 151, 732 A.2d 133 (1999); *First Bethel Associates* v. *Bethel,* supra, 744; *Bugryn* v. *Bristol,* 63 Conn. App. 98, 103, 774 A.2d 1042, cert. denied, 256 Conn. 927, 776 A.2d 1143, cert. denied, 534 U.S. 1019, 122 S. Ct. 544, 151 L. Ed. 2d 422 (2001). Accordingly, we will review the trial court's thoughtful and comprehensive decision

in this tax appeal utilizing the deferential clearly erroneous standard of review.

## B

The following additional facts are necessary for the resolution of the plaintiff's claim. At trial, the plaintiff's appraisers, the defendant's appraisers, and the court utilized substantially the same standard[20] for determining the highest and best use of the subject property as improved real estate.[21] The defendant's appraisers, Kerin and Glendinning, were of the opinion that the property's best use, as improved, on the date of valuation was "its continued present use as an industrial facility by [the plaintiff] or some comparable entity taking advantage of the special-purpose improvements in place." They based that conclusion on: the fact that the property's improvements were designed and constructed to the plaintiff's specifications; the continued legal feasibility of the present use under East Windsor zoning laws; the continued financial feasibility of the present use; and the fact that their highest and best use determination reflects the "the market value contribution of the special-purpose features in the subject property." By contrast, the plaintiff's appraisers, Kinnard and Grant, reached a more generalized highest and best use conclusion, which was the property's "continued

[20] Both the plaintiff's and the defendant's appraisers utilized the definition set forth in The Dictionary of Real Estate Appraisal (3d Ed. 1993) p. 171, which defines "highest and best use" as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." The appraisers' definition is virtually identical to the highest and best use standard utilized by our courts. See, e.g., *Metropolitan District* v. *Burlington*, 241 Conn. 382, 390, 696 A.2d 969 (1997).

[21] The trial court also made a determination of the property's highest and best use as vacant land. That determination is not at issue in this appeal because the parties and the trial court all agree that, the highest and best use of the property as vacant land would be its development as a single tenant or owner occupied industrial facility.

use as an industrial manufacturing-repair-office facility with a single user-occupant." In arriving at their more general conclusion, Kinnard and Grant utilized the same factors and made very similar observations as those of Kerin and Glendinning. In its written memorandum of decision, the trial court ultimately adopted a determination closer to that of the defendant's appraisers, concluding that "the highest and best use of the subject premises as improved would be . . . its continued use as an industrial facility as presently used by [the plaintiff]."

A property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and actual value. *Metropolitan District* v. *Burlington*, 241 Conn. 382, 390, 696 A.2d 969 (1997). "[U]nder the general rule of property valuation, fair [market] value, of necessity, regardless of the method of valuation, takes into account the highest and best value of the land." (Internal quotation marks omitted.) Id. A property's highest and best use is commonly defined as "the *use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate*." (Emphasis added; internal quotation marks omitted.) Id. The highest and best use determination is inextricably intertwined with the marketplace because "fair market value" is defined as " 'the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use.' " *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 34, 633 A.2d 1368 (1993), quoting *Mazzola* v. *Commissioner of Transportation*, 175 Conn. 576, 581–82, 402 A.2d 786 (1978). The highest and best use conclusion necessarily affects the rest of the valuation process because, as the major factor in determining the scope of the market for the property, it dictates which

methods of valuation are applicable.[22] Finally, a trier's determination of a property's highest and best use is a question of fact that we will not disturb unless it is clearly erroneous.[23] See, e.g., *Carol Management Corp.* v. *Board of Tax Review*, supra, 38; *Stamford Apartments Co.* v. *Stamford*, 203 Conn. 586, 592, 525 A.2d 1327 (1987); *Peter Rock Associates* v. *North Haven*, 59 Conn. App. 1, 4, 756 A.2d 290, cert. denied, 254 Conn. 933, 761 A.2d 754 (2000).

In the present case, we conclude that the trial court's highest and best use determination is not clearly erroneous. The trial court carefully considered the testimony and written reports of four expert appraisers. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Cita-

[22] For example, an extremely narrow highest and best use conclusion might result in a very small or even nonexistent market, thereby eliminating the availability of market sales analysis as a useful valuation tool. See J. Eaton, Real Estate Valuation in Litigation (2d Ed. 1995) p. 242 ("A special-purpose property is one with a physical design peculiar to a specific use, no apparent market other than sale to an owner-user, and no financially feasible alternative use. The lack of comparable sales data is generally the key in distinguishing a special-purpose property.").

[23] The plaintiff argues that the trial court's highest and best use conclusion violated the law because it was improperly restrictive, and urges that we apply plenary review to the trial court's determination of the property's highest and best use. The plaintiff, however, acknowledges throughout its brief that the controlling legal definitions and principles are generally not at issue in this appeal. Its arguments are "essentially factual, and recount the evidence and arguments presented at trial." *Newbury Commons Ltd. Partnership* v. *Stamford*, supra, 226 Conn. 98. Inasmuch as the plaintiff's arguments are grounded in an attack on the trial court's factual analysis and conclusions, we, accordingly, adhere to the clearly erroneous standard of review in our review of the trial court's highest and best use finding.

tions omitted; internal quotation marks omitted.) *Newbury Commons Ltd. Partnership* v. *Stamford*, supra, 226 Conn. 99. Furthermore, the trial court's findings as to the property's special features as expressed in its written memorandum have strong support in the record and in the reports of all the appraisers. The court conducted an exhaustive inquiry into the design and construction of the plaintiff's facility, ultimately concluding, "we have a top of the line, class A building constructed in 1988 for the needs of a specific tenant . . . [and] based upon all the factors discussed in this opinion, as well as our analysis of the appraisers' efforts in determining valuation and our own knowledge regarding values . . . [the plaintiff] has not met its burden of showing that the property was overvalued." (Citations omitted.)

The plaintiff's reliance on *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 767 A.2d 1169 (2001), and *Connecticut Printers, Inc.* v. *Redevelopment Agency*, 159 Conn. 407, 270 A.2d 549 (1970), for the proposition that the trial court improperly failed to consider the marketplace in reaching its highest and best use determination, is misplaced. Both of those cases involved the well established proposition that in the eminent domain context, the "special adaptability of land for a particular purpose" will only be properly considered in valuation "if there is a reasonable probability that the land could be so used within a reasonable time and with economic feasibility." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *Towpath Associates*, supra, 544; see also *Connecticut Printers, Inc.* v. *Redevelopment Agency*, supra, 412–13. In *Towpath Associates*, we reversed a trial court's determination that the highest and best use for condemned land with an old bridge abutment was a future use as a bridge site. *Commissioner of Transportation* v. *Towpath Associates*, supra, 554. We con-

cluded that the trial court's determination was improperly speculative because there was no evidence that anyone other than the condemnor would use the site for a bridge, and noted that even the two property owners in that case no longer used their properties as bridge sites. Id., 552–53. Similarly, in *Connecticut Printers, Inc.*, the plaintiff wanted its building's special features as a printing plant taken into account when valuing its property for purposes of compensation after a governmental taking. *Connecticut Printers, Inc.* v. *Redevelopment Agency*, supra, 411–12. The trial referee found that the building's highest or best use could not be as a printing plant because "no printing or bookbinding concern would build or lease a . . . building of this type, at this location, on the date of the taking." Id., 413. We deferred to the trial court's decision in that case, concluding that it was supported by ample evidence. Id. In the present case, the plaintiff's continued profitable use of its East Windsor property supports the trial court's highest and best use conclusion. We conclude that because the trial court gave careful consideration to the expert testimony and reports, and its findings are amply supported in the record, its highest and best use determination is not clearly erroneous and will therefore not be disturbed on appeal.

## II

The plaintiff also claims that the trial court improperly admitted into evidence as relevant the defendant's appraisers' report in that it was based on an unduly restrictive highest and best use standard. We disagree with this claim.

"It is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse

of discretion." (Citation omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 368–69, 788 A.2d 496 (2002); *State* v. *Copas*, 252 Conn. 318, 326, 746 A.2d 761 (2000).

The law of relevance is well settled. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Copas*, supra, 252 Conn. 326–27. "Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 686, 800 A.2d 1160 (2002).

The trial court plainly did not abuse its discretion by admitting the defendant's appraisers' report into evidence. In light of our holding in part I B of this opinion that the trial court's finding as to the property's highest and best use was not improper, the defendant's appraisers' report is logically relevant to the determination of the property's value.

### III

The plaintiff further argues that the trial court improperly admitted the defendant's appraisers' report into evidence because it did not satisfy the relevance and reliability standards for admissibility of expert testimony under § 7-2 of the Connecticut Code of Evidence, *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra,

509 U.S. 589–92, and *State* v. *Porter*, supra, 241 Conn. 69. The plaintiff also claims that the trial court improperly denied it an opportunity to challenge the admissibility of the report claim by failing to hold a meaningful hearing on the issue and by refusing to allow it to file a motion in limine to preclude the report, thus abusing its discretion by abandoning its *Porter* gatekeeping responsibilities. We decline to reach these claims because we find that the plaintiff did not properly raise them in the trial court, thus leaving them unpreserved for appellate review.

"The standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of his objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *Pestey* v. *Cushman*, supra, 259 Conn. 365; *State* v. *Bush*, 249 Conn. 423, 427–28, 735 A.2d 778 (1999); see Practice Book § 5-5.

Our review of the record indicates that, when the plaintiff objected to the introduction of the defendant's appraisers' report, it made absolutely no reference at any time to the court's gatekeeping role under *Porter* when stating the basis for its objection. The plaintiff's arguments were not based on the rules of evidence,[24] but, rather, on the highest and best use conclusion that

---

[24] We note that the plaintiff also failed to move for articulation of the evidentiary grounds for the trial court's ruling or for any kind of limitation on the use of the appraisers' report.

formed the basis for the report. The trial court did in fact permit the plaintiff to conduct a voir dire examination of Glendinning, who coauthored the report. The plaintiff confined that inquiry to the highest and best use conclusion. The closest the plaintiff ever came to arguing a *Porter* issue during the trial was when it requested the court's permission to reserve for a later time its right to make a motion to preclude.[25] Proper preservation of claims for appellate review requires that "the trial court [be] effectively . . . alerted to a claim of potential error while there [is] still time for the court to act." *Pestey* v. *Cushman*, supra, 259 Conn. 367. Because the plaintiff failed to preserve properly these claims, we decline to review them.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[25] When the trial court denied the plaintiff's request, it stated: "I'm not going to have the witness qualify as an expert witness, have his appraiser report introduced, and then have you challenge whether or not that report should have been introduced to begin with. We'll deal with it now. If you have any offer of proof that this witness is violating the laws of the state of Connecticut, as you have alleged, I'll hear . . . your argument. But I will not let this . . . objection rest to another time. I'll decide the issue right now."