SUN VALLEY CAMPING COOPERATIVE, INC. *v.*
TOWN OF STAFFORD
(AC 25876)

DiPentima, Gruendel and Dupont, Js.

Argued November 15, 2005—officially released April 11, 2006

*Carole W. Briggs*, for the appellant (plaintiff).

*Christopher M. Reeves*, for the appellee (defendant).

*Opinion*

DUPONT, J. The plaintiff, Sun Valley Camping Cooperative, Inc., appeals from the judgment of the trial court determining that the tax assessment of its cooperative campground property, as of October 1, 2000, pursuant to General Statutes § 12-117a, should have been $2,200,000 instead of $3,019,720 as assessed by the

defendant, the town of Stafford.[1] On appeal, the plaintiff claims that the court improperly (1) analyzed the cost approach valuation of its expert,[2] (2) permitted the defendant to value its alleged unique, special purpose property[3] relying solely on the market sales approach when no comparable sales existed and (3) relied on the defendant's market sales valuation and data that was based on dissimilar properties and inaccurate sales data. We reverse the judgment of the trial court.

The basic question of law underlying the plaintiff's claims is whether the court determined the true and actual value of the property, for the purposes of § 12-117a, as required by the Common Interest Ownership Act (CIOA), General Statutes § 47-200 et seq., particularly General Statutes §§ 47-202[4] and

[1] On the grand list of October 1, 1999, the property had been assessed at $743,200. The plaintiff's appeal to the Superior Court from the board of assessment appeals related to the grand list of October 1, 2000. The plaintiff subsequently amended its appeal to include the grand lists of October 1, 2001, 2002 and 2003.

[2] Although the court reduced the defendant's assessment, the plaintiff argues on appeal that the assessment should be further reduced to reflect the testimony of the plaintiff's expert witness that the fair market value of the property was $734,100 as of October 1, 2000.

[3] At oral argument, the attorneys for both the plaintiff and the defendant agreed that the plaintiff's cooperative campground fit within the definition of a special purpose property, although the court specifically stated in its "Response to Plaintiff's Motion for Articulation and Rectification" that it was not a special purpose property.

[4] General Statutes § 47-202 contains the definitions applicable to CIOA. Those that are relevant to this case are: "(4) 'Common elements' means (A) in the case of (i) a condominium or cooperative, all portions of the common interest community other than the units; and (ii) a planned community, any real property within a planned community owned or leased by the association, other than a unit, and (B) in all common interest communities, any other interests in real property for the benefit of unit owners which are subject to the declaration. . . .

"(7) 'Common interest community' means real property described in a declaration with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for (A) real property taxes on, (B) insurance premiums on, (C) maintenance of, or (D) improvement of, any other real property other than that unit described in the declaration. 'Ownership of a unit' includes holding a leasehold interest of forty years or more in a unit,

47-204 (a).[5] "CIOA is a comprehensive legislative scheme that governs the creation, organization and management of all forms of common interest communities." *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 237 Conn. 123, 130, 676 A.2d 369 (1996).

including renewal options. 'Ownership of a unit' does not include the interest which a resident holds in a mutual housing association, as defined in subsection (b) of section 8-214f, by virtue of either a state contract for financial assistance or an individual occupancy agreement. An association of property owners funded solely by voluntary payments from those owners is not a common interest community. . . .

"(10) 'Cooperative' means a common interest community in which the real property is owned by an association, each of whose members is entitled by virtue of his ownership interest in the association to exclusive possession of a unit. . . .

"(13) 'Declaration' means any instruments, however denominated, that create a common interest community, including any amendments to those instruments. . . .

"(26) 'Real property' means any leasehold or other estate or interest in, over, or under land, including structures, fixtures, and other improvements and interests that by custom, usage, or law pass with a conveyance of land though not described in the contract of sale or instrument of conveyance. 'Real property' includes parcels with or without upper or lower boundaries, and spaces that may be filled with air or water. . . .

"(31) 'Unit' means a physical portion of the common interest community designated for separate ownership or occupancy, the boundaries of which are described pursuant to subdivision (5) of subsection (a) of section 47-224. If a unit in a cooperative is owned by a unit owner or is sold, conveyed, voluntarily or involuntarily encumbered or otherwise transferred by a unit owner, the interest in that unit which is owned, sold, conveyed, encumbered or otherwise transferred is the right to possession of that unit under a proprietary lease, coupled with the allocated interests of that unit, and the association's interest in that unit is not thereby affected. . . .

"(32) 'Unit owner' means a declarant or other person who owns a unit, or a lessee of a unit in a leasehold common interest community whose lease expires simultaneously with any lease the expiration or termination of which will remove the unit from the common interest community, but does not include a person having an interest in a unit solely as security for an obligation. In a condominium or planned community, the declarant is the owner of any unit created by the declaration. In a cooperative, the declarant is treated as the owner of any unit to which allocated interests have been allocated until that unit has been conveyed to another person."

[5] General Statutes § 47-204 (a) provides: "In a cooperative, a unit owner's interest in a unit and its allocated interests is a real property interest for all purposes, except that the real property constituting the cooperative shall

The court agreed that CIOA applies and that § 47-204 (a) governs the valuation of a cooperative. The defendant does not argue that a cooperative is not a common interest community or that § 47-204 (a) is not applicable. Instead, the defendant limits its argument to the assertion that the court did not have to use a cost approach method of valuation, even if the property were a special purpose property,[6] but could use market sales as urged by the defendant. The defendant's basic argument is that the plaintiff is attempting to retry the case by insisting on its appraiser's method of appraisal, rather than accepting that the court could, on the basis of its assessment of the credibility of the two opposing appraisers, choose the method of valuation used by the defendant's appraiser.

We conclude that the court was correct, as a matter of law, in its determination that § 47-204 (a) controls the assessment involved in this appeal. We further conclude that, as a matter of law, the court's adoption of a comparable sales method of valuation, which uses the average individual unit value and multiplies it by the number of units of which the cooperative is comprised, to establish the value of the plaintiff's entire parcel of real estate, violates § 47-204 (a), and, therefore, the judgment of the court must be set aside and the case remanded for a new trial.

General Statutes § 12-64 (a) provides that all nonexempt real estate "shall be liable to taxation at a uniform percentage of its present true and actual valuation . . . to be determined by the assessors . . . ." "Each . . .

---

be taxed and assessed as a whole and a unit owner's interest shall not be separately taxed."

[6] "A special purpose property is one with a physical design peculiar to a specific use, no apparent market other than sale to an owner-user, and no financially feasible alternative use. The lack of comparable sales data is generally the key in distinguishing a special-purpose property." J. Eaton, Real Estate Valuation in Litigation (2d Ed. 1995) p. 242.

municipality shall assess all property for purposes of the local property tax at a uniform rate of seventy per cent of present true and actual value, as determined under section 12-63." General Statutes § 12-62a (b). "The present true and actual value of all . . . property, [other than farmland, forest land and open space land] shall be deemed by all assessors and boards of assessment appeals to be the fair market value thereof and not its value at a forced or auction sale." General Statutes § 12-63 (a).

An understanding of real estate appraisal principles is essential to understanding the statutory obligation placed on municipalities assessing real property and the duty of Connecticut courts reviewing assessments. According to our Supreme Court, as well as real estate appraisers, the usual starting point for the analysis of a property's true and actual value is the property's highest and best use.[7] *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 25, 807 A.2d 955 (2002); see also J. Eaton, Real Estate Valuation in Litigation (2d Ed. 1995) pp. 103, 129. "The highest and best use determination is inextricably intertwined with the marketplace because fair market value is defined as the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. . . . The highest and best use conclusion necessarily affects the rest of the valuation process because, as the major factor in determining the scope of the market for the property, it dictates which methods of valuation are applicable." (Citations omitted; internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, supra, 25–26. "For example, an extremely narrow highest and best use conclusion might result in a very small or even nonexistent market, thereby elimi-

---

[7] The parties and the court in this case agree that the highest and best use of the property is as a cooperative campground.

nating the availability of market sales analysis as a useful valuation tool." (Internal quotation marks omitted.) Id., 26 n.22. In other instances, the highest and best use of property as a factor in valuation must be abandoned in favor of the particular present use of the property. E.g., *Rustici* v. *Stonington*, 174 Conn. 10, 13, 381 A.2d 532 (1977).

"There are three accepted methods of valuation which may be used for the assessment of real property. They are the comparable sales approach,[8] the income [capitalization] approach[9] [and] the . . . cost approach."[10] (Internal quotation marks omitted.) *Four*

[8] The comparable sales approach is also known as the "market data approach" or "sales comparison approach." J. Eaton, supra, pp. 197–98. "It is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised. The reliability of this technique is dependent upon (a) the availability of comparable sales data, (b) the verification of the sales data, (c) the degree of comparability or extent of adjustment necessary for time differences, and (d) the absence of non-typical conditions affecting the sales price." American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers, Real Estate Appraisal Terminology (Rev. Ed. 1981) p. 160. After identifying comparable sales, the appraiser makes adjustments to the sales prices "based on elements of comparison." The Dictionary of Real Estate Appraisal (3d Ed. 1993) p. 318.

[9] The income capitalization approach consists of the following seven steps: (1) estimate gross income; (2) estimate vacancy and collection loss; (3) calculate effective gross income (i.e., deduct vacancy and collection loss from estimated gross income); (4) estimate fixed and operating expenses and reserves for replacement of short-lived items; (5) estimate net income (i.e., deduct expenses from effective gross income); (6) select an applicable capitalization rate; and (7) apply the capitalization rate to net income to arrive at an indication of the market value of the property being appraised. J. Eaton, supra, p. 194. The process is based on the principle that the amount of net income a property can produce is related to its market value. Id. This approach only has utility where the property under appraisal is income producing in nature. Id. In this appeal, the parties agree that the income approach is inappropriate.

[10] Under the cost approach, the appraiser estimates the current cost of replacing the subject property with adjustments for depreciation, the value of the underlying land and entrepreneurial profit. J. Eaton, supra, p. 157. "This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market." The Appraisal of Real Estate, Appraisal Institute (10th Ed. 1992) p. 80.

*D's, Inc.* v. *Mattera*, 25 Conn. App. 308, 315, 594 A.2d 484 (1991). "Each of these is an approved method of ascertaining the actual value of real estate for purposes of taxation." (Internal quotation marks omitted.) *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, 220 Conn. 335, 342, 597 A.2d 326 (1991).

"In § 12-117a tax appeals, the trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. . . . Once the taxpayer has demonstrated aggrievement by proving that its property was overassessed, the trial court [will] then undertake a further inquiry to determine the amount of the reassessment that would be just." (Citations omitted; internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, supra, 262 Conn. 22–23.

In this case, the court found that the plaintiff was aggrieved[11] and then determined the value of the property, on the basis of the testimony and report of the defendant's appraiser. Ordinarily, a court's decision as to the value of the property is reviewed pursuant to the clearly erroneous standard. See *Grolier, Inc.* v. *Danbury*, 82 Conn. App. 77, 78, 842 A.2d 621 (2004). In some cases, however, on the basis of the substance of the particular claims of a taxpayer, the standard of review is plenary because there is a question of law, such as the construction of a statute. See *Albahary* v. *Bristol*,

[11] The issue of aggrievement implicates a court's subject matter jurisdiction. *Rocque* v. *DeMilo & Co.*, 85 Conn. App. 512, 519, 857 A.2d 976 (2004). The court must determine "whether the board's action aggrieved the taxpayer." *Davis* v. *Westport*, 61 Conn. App. 834, 842, 767 A.2d 1237 (2001). "An affirmative finding of aggrievement is an absolute condition precedent to the second function, [the finding of the properly assessed value]." Id. Reviewing the entire record, we conclude that the court's determination that the taxpayer was aggrieved and the facts underlying that determination are legally correct and factually supported.

276 Conn. 426, 436, 886 A.2d 802 (2005); *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, 266 Conn. 706, 714–15, 835 A.2d 33 (2003); *Jones* v. *O'Connell*, 189 Conn. 648, 652, 458 A.2d 355 (1983); *Davis* v. *Westport*, 61 Conn. App. 834, 842–43, 767 A.2d 1237 (2001).

The plaintiff in its complaint claims that its property assessment was "grossly excessive, disproportionate, and unlawful." The plaintiff not only claims that the assessment was excessive, but that it was invalid because the method used by the court found the average value of a unit in the plaintiff's campground, then multiplied that average by the number of units in the campground to reach a fair market value of the whole cooperative. The average value of each unit was found by the court based, in part, on "comparable sales" of units in other campgrounds. The plaintiff argues that this valuation is in derogation of § 47-204 (a). Whether the method violated that statute is a question of law because it involves a statutory interpretation, namely, whether the court could consider the average value of the individual units, in order to find the market value of the whole cooperative. See *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, supra, 266 Conn. 714–15. Whether this question of law, after plenary review, must be resolved in favor of the plaintiff depends on the language used in CIOA, particularly §§ 47-202 (10) and (31), and 47-204 (a), and the Uniform Common Interest Ownership Act Annotated[12] on which Connecticut's law is largely modeled, the particular facts of this case and the declaration that created the plaintiff's common interest community.

[12] Section 1-105 of the Uniform Common Interest Ownership Act states that, generally, a unit owner's interest is personalty, unless otherwise provided. Connecticut, in General Statutes § 47-204 (a), has otherwise provided by stating that the unit owner's interest is real estate, except that "the real property constituting the cooperative shall be taxed and assessed as a whole and a unit owner's interest shall not be separately taxed."

The plaintiff urges this court to conclude that the court improperly considered the comparable sales approach utilized by the defendant's appraiser because the unit of measure utilized by the appraiser was wrong as a matter of law. The resolution of this question rests on our interpretation of § 47-204 (a).[13] Under § 47-204 (a), "the real property constituting [a] cooperative shall be taxed and assessed as a whole and a unit owner's interest shall not be separately taxed."

"The process of statutory interpretation involves a reasoned search for the intention of the legislature." (Internal quotation marks omitted.) *Wasko* v. *Manella*, 269 Conn. 527, 534, 849 A.2d 777 (2004). "In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 562 n.20, 816 A.2d 562 (2003).[14]

When interpreting a statute, we look first to its text, and to its relationship to other statutes, to ascertain whether its meaning is plain. See General Statutes § 1-

---

[13] The plaintiff's brief asserts that this is a case of first impression. We agree, as we are unaware of any Connecticut cases interpreting General Statutes § 47-204 (a).

[14] General Statutes § 1-2z "legislatively overruled that part of *Courchesne* in which [our Supreme Court] stated that [it] would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text." *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, supra, 266 Conn. 716 n.10. Thus, the legislature did not purport to overrule the Supreme Court's definition of the task of statutory interpretation.

2z. "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 134 n.19, 848 A.2d 451 (2004). A statute's silence on a particular issue does not necessarily render it ambiguous. Id. "If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 405, 891 A.2d 959 (2006).

"[S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 158, 788 A.2d 1158 (2002). "[W]e are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . ." (Internal quotation marks omitted.) *Pantanella* v. *Enfield Ford, Inc.*, 65 Conn. App. 46, 55, 782 A.2d 141, cert. denied, 258 Conn. 930, 783 A.2d 1029 (2001). "[T]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them." (Internal quotation marks omitted.) *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 717, 674 A.2d 845 (1996). The legislation involved in this case is §§ 12-64 (a) and 47-200 et seq.

Section 12-64 (a) provides in relevant part that "[a]ll the following-mentioned property, not exempted, shall be set in the list of the town where it is situated and, except as otherwise provided by law, shall be liable to taxation at a uniform percentage of its present true and

actual valuation . . . to be determined by the assessors . . . . Any interest in real estate shall be set by the assessors in the list of the person in whose name the title to such interest stands on the land records. . . ." Consistently, Connecticut courts have interpreted § 12-64 (a) to allow municipalities to tax those real property interests enumerated in § 12-64 (a), as well as real property interests of the same general character, and to list those interests in the name of the record owner. *Hartford Electric Light Co.* v. *Wethersfield,* 165 Conn. 211, 217–18, 332 A.2d 83 (1973). Pursuant to § 47-202 (10), a cooperative is a "common interest community in which the real property is owned by an association . . . ."[15] Accordingly, the association, as a whole, is the record owner of the real property held by the cooperative and liable to taxation under § 12-64 (a).

Although § 12-64 (a) makes it clear that the plaintiff, the Sun Valley Camping Cooperative, Inc., is the record owner of the real property to be taxed, it is silent as to the method to be used to establish the amount of the tax due.

The question is whether the defendant, although it may tax and assess the plaintiff's property only as a whole, can legally, in accordance with § 47-204 (a), use the individual units of the camping cooperative as the unit of measurement to determine the true and actual value of the entire cooperative. The answer to that question lies within the words of § 47-204 (a).

CIOA, which governs the cooperative form of ownership, defines a cooperative as "a common interest community in which the real property is owned by an association, each of whose members is entitled by virtue of his ownership interest in the association to exclu-

---

[15] Title to the real property held in the cooperative form of ownership must be in the association's name. The court found that the subject property, on February 24, 1988, was deeded to Sun Valley Camping Cooperative, Inc.

sive possession of a unit." General Statutes § 47-202 (10). General Statutes § 47-204 (a) elaborates further that, in Connecticut, a cooperative member's interest in a unit and its allocated interests is a real property interest. An understanding of the meaning of this provision must take into account the reality that, prior to the enactment of CIOA, cooperative ownership was regarded as a legal hybrid. "For some purposes, the 'owner' of such [an interest] has legal title and an interest in real property, while for other purposes his rights as a tenant of the corporation and a holder of its stock more closely resemble an interest in personal property." *Jones* v. *O'Connell*, supra, 189 Conn. 654. Read in context, the first part of § 47-204 (a) denies the traditional hybrid status of cooperative ownership under Connecticut law and requires classification of the interest as real property. Furthermore, read together, §§ 47-204 (a) and 47-202 (10) explain that by virtue of a cooperative member's ownership interest in the association, the member is vested with a possessory, real property interest in a unit within the real property owned by the association.

Although a cooperative member's interest is a real property interest, § 47-204 (a) contains an exception to the usual consequences of owning an interest in realty. That exception provides that "the real property constituting the cooperative shall be taxed and assessed as a whole and a unit owner's interest shall not be separately taxed." General Statutes § 47-204 (a). The unit owners were not separately taxed by the defendant, and we are therefore concerned only with the words "the real property constituting the cooperative shall be taxed and assessed as a whole . . . ." General Statutes § 47-204 (a).

The language of § 47-204 (a) does more than merely prohibit a municipality from using its taxing power to levy a tax on a unit owner. The cooperative's real estate

is not only "taxed" as a whole, it is "assessed" as a whole. To "assess" is to list and value property for the purpose of taxation. An assessment is a listing and valuation of property as a basis on which taxes are to be collected. Ballentine's Law Dictionary (3d Ed. 1969). A tax is a charge assessed in accordance with a reasonable rate by a governmental entity upon property. Id. Thus, "assessment" must be distinguished from "taxation." The latter is based on the former, and both words must be accorded validity, as used in the statute. To interpret § 47-204 (a) merely to require municipalities to levy a tax against the cooperative as a whole, instead of the individual members of the cooperative, without requiring an assessment as a whole, would violate a canon of construction. We must construe statutes so that "no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *Semerzakis* v. *Commissioner of Social Services*, 274 Conn. 1, 18, 873 A.2d 911 (2005). Cooperative property must therefore be both assessed as a whole, without regard to the value of individual units, and taxed as a whole. We conclude that the text of § 47-204 (a) is susceptible to a single, reasonable interpretation. The plain language of § 47-204 (a) prohibits a municipality from using the true and actual value of the individual units as the basis of measurement to determine true and actual value of the cooperative as a whole for purposes of taxation.[16]

The procedural background of this case is not in dispute. The plaintiff first appealed to the Stafford board of assessment appeals, which denied the plaintiff's request for a reduction of the assessment of its

---

[16] The court recognized the perils associated with individual unit valuations when it stated in its memorandum of decision that "[t]he danger in valuing the individual campsites to make up the whole is that the value of all of the units combined could exceed the value of the entire campground." It nevertheless accepted the defendant's valuation.

real property. Pursuant to § 12-117a, the plaintiff filed an appeal with the Superior Court, seeking review of the decision by the board of assessment appeals and claiming that the valuation of its real property was grossly excessive, disproportionate and unlawful.[17]

The plaintiff's property, which consists of 56.84 acres, is divided into 303 campsites[18] and is located at 51 Old Springfield Road in Stafford Springs. The property is not located on a public street and is accessed by an easement over the land of another property owner. On February 24, 1988, Robert N. Minor conveyed the property to Sun Valley Associates Limited Partnership by warranty deed. On the same date, Sun Valley Associates Limited Partnership conveyed the property to Sun Valley Camping Cooperative, Inc. Since that date, the property has been used as a cooperative campground. The property is improved with one lane gravel roadways, several communal bathroom shelters, with and without showers, and an enclosed gazebo. Each campsite is

[17] A claim that a property has been assessed wrongfully or illegally may be appealed either to the board of tax review and then to the Superior Court within two months, pursuant to General Statutes § 12-117a, or by direct action to the Superior Court within one year, pursuant to General Statutes § 12-119. *Davis* v. *Westport*, supra, 61 Conn. App. 847.

There is a distinction between an excessive assessment and an illegal, unlawful or wrongful assessment. Id. General Statutes § 12-117a, formerly General Statutes § 12-118, is the avenue to review the amount of an assessment, and § 12-119 is the way to contest the taxability itself. The selection of an inappropriate method of appraisal is not an illegal or wrongful assessment. *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, supra, 220 Conn. 343. This case was tried and decided as a § 12-117a, or excessive assessment case, and we need not decide whether § 12-119 could have been applicable. We note, however, that the unit owners were not individually taxed by the defendant, which would have been a clear violation of General Statutes § 47-204 (a).

[18] The defendant's appraiser testified that there were 275 campsites, and the court adopted that number. The exhibits, including maps of the 56.84 acres, and the declaration of the cooperative clearly establish that there are 303 campsites within that acreage. A trial court does not have any discretion to value property on the basis of inaccurate information. *Konover* v. *West Hartford*, 242 Conn. 727, 736–37, 699 A.2d 158 (1997).

serviced with electricity and water. Beach rights for a limited number of years are afforded to unit owners. Any personalty on the land may be taxed to the unit owners as individuals.

The public offering declaration, as amended, filed pursuant to § 47-202 (13), states that the ownership of a unit is an interest in the association and gives the owner the exclusive right to possession. A unit is not taxed individually for the value of the real estate, but the unit owner may be taxed for the value of the personalty on the campsite. The cooperative is "taxed and assessed as a whole . . . ." General Statutes § 47-204 (a). Unit owners pay a proportionate share of common expenses. Paragraph twenty-two of the declaration provides that each unit owner must pay a rental fee for common areas and other expenses. The average area of a campsite is 3000 to 4000 square feet, and all the campsites are not of equal size. The declaration also provides that no portion of the campground may be transferred by a unit owner, and 100 percent of the unit owners must agree before ownership of the campground can be transferred. There was testimony at trial that 80 percent of the unit owners could effectuate a transfer of title to the property. Whether a sale could be effectuated by 100 percent or 80 percent of the unit owners, it is not likely that the property could be readily sold.

These facts reinforce our conclusion, after a plenary review, that the valuation used by the court, which involved the average price of a unit, cannot stand and that the case must be remanded for a new trial. Because the parties have raised issues relating to the methodology that should be used in valuing this property, we discuss those claims to the extent that they may recur in any subsequent trial. These issues primarily relate to whether the plaintiff's property is a special purpose property and, if so, whether a particular method of

valuation is mandated in order to assess the plaintiff's property properly.

The appraiser for the defendant selected the comparable sales approach to arrive at the value of the property. The appraiser used the sale price per camping site as the primary unit of comparison, explaining that properties such as the plaintiff's are not typically sold as an entire campground. He determined that the average sale price per campsite was $11,000, and then multiplied it by 275, the number of campsites he believed the property contained, to reach its valuation of $3,025,000.[19]

In arriving at a valuation of the plaintiff's property as of October 1, 2000, the plaintiff's appraiser utilized the cost approach, using sales of vacant, raw land because, in his opinion, use of the comparable sales approach was not feasible due to the lack of comparable sales of cooperative campgrounds as a whole. The report also detailed that the cost approach adds the depreciated value of improvements to the value of the land, as if it were vacant.

The issue that will recur on retrial is contained within the plaintiff's argument that its real estate is a special purpose property for which no comparable sales exist, thereby requiring, as a matter of law, a valuation on the basis of the cost approach, as used by its expert. We are unaware of any Connecticut appellate case that specifically answers the question of whether a parcel of real estate, used as a cooperative campground, is necessarily a special purpose property and, if so, whether a particular method is required to arrive at its true and actual value for taxation and assessment purposes.

---

[19] We note that the value reached by the defendant's appraiser, $3,025,000, is slightly more than the original value assessed by the defendant, $3,019,720.

Cooperative ownership, to the extent it has been discussed by case law and treatises, is usually defined in terms of apartments. It is "a form of ownership in which each owner of stock in a cooperative apartment building or housing corporation receives a proprietary lease on a specific apartment and is obliged to pay a rental which represents the proportionate share of operating expenses and debt service on the underlying mortgage, which is paid by the corporation." The Appraisal of Real Estate, Appraisal Institute (10th Ed. 1992) p. 132.

A special purpose property is defined as real estate appropriate for only one use or a limited number of uses, whose highest and best use is probably a continuation of its present use. Id., 293. A limited use property or special purpose property has relatively few potential buyers or has a limited demonstrable market. Id., 23; J. Eaton, supra, p. 242. It is usually defined in terms of buildings with a special purpose, but also includes theme parks and golf courses. The Appraisal of Real Estate, supra, p. 49. It has a unique physical design, special construction or layout that restricts its utility to the use for which it was built. S. McKim III, "Is Michigan's Ad Valorem Property Tax Becoming Obsolete?" 77 U. Det. Mercy L. Rev. 655, 673–74 (2000). A two mile long private road has been determined to be a special use property, and its value is its market value as improved. *Pepe* v. *Board of Tax Review*, 14 Conn. App. 705, 708–709, 542 A.2d 756 (1988). A special purpose classification may cause an exception to the use of usual valuation methods. J. Youngman, "Defining and Valuing the Base of Property Tax," 58 Wash. L. Rev. 713, 755 (1983). It has also been noted that a reproduction cost approach is "often used when a special purpose property must be assessed . . . ." (Citation omitted.) *Whitney Center, Inc.* v. *Hamden*, 4 Conn. App. 426, 428, 494 A.2d 624 (1985).

It is likely that on retrial, a court would find that the plaintiff's property is a special purpose property because of the limited likelihood of any sale, the fact that the sites have individual hookups for water, sewage and utilities, and the paucity or lack of any comparable sales of an entire recreational cooperative campground. No single method of valuation is controlling for the finding of fair market value for a special purpose property, at least in eminent domain cases.[20] *Brothers, Inc.* v. *Ansonia Redevelopment Agency,* 158 Conn. 37, 45, 255 A.2d 836 (1969). This is so because the usual means of ascertaining market value, such as sales of like property, may not be appropriate when land is devoted to a special purpose. *Feigenbaum* v. *New Britain Housing Site Development Agency,* 164 Conn. 254, 260, 320 A.2d 824 (1973).

One Connecticut case, without any mention or specific finding of whether the valuation involved a special purpose property, utilized the property's current use, rather than the highest and best use of the land, in order to find its true and actual value. See *Rustici* v. *Stonington,* supra, 174 Conn. 13. In *Rustici,* the assessment of a golf course was found by aggregating the value of the raw land per acre, as established by comparable sales of raw land, the cost per acre of improving the fairways and the cost of construction of the greens without consideration of the value of the underlying land. Id., 12. A valuation must sometimes involve more than one single theory or methodology of assessment because of the particular facts. *Heather Lyn Ltd. Part-*

[20] "The problem which has sometimes arisen in eminent domain proceedings of valuing property which is specially designed or limited in usefulness so that it does not have a readily ascertainable market value in the usual sense has led courts and textwriters to the use of descriptions such as 'special use,' 'special purpose,' 'specialty,' and the like. . . . We find no precise legal distinction between the terms 'special use' and 'special purpose' . . . ." *Brothers, Inc.* v. *Ansonia Redevelopment Agency,* 158 Conn. 37, 41–42, 255 A.2d 836 (1969).

*nership* v. *Griswold*, 38 Conn. App. 158, 164, 659 A.2d 740 (1995). It is for the court on remand to determine the appropriate method for a determination of the true and actual value for the property's assessment.

Because the court improperly applied the law, we set aside its judgment, as to the valuation of the property, and remand the case for a new trial to determine the true and actual value of the plaintiff's property.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.