[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
These two actions involve condemnations of two parcels of land located on Main Street, in the City of New Britain. Docket No. CV 00 0503209 is a taking of a parcel of land containing 5716 square feet of land and a two story retail/apartment building for highway safety improvements. This property, known as 648 Main Street, was purchased by the defendants, Vincenzo and Valerie Miceli, on October 31, 1986 for $100,000. The ground floor of the building contained the Firehouse Pizza restaurant on one side and Roly Poly Bakery on the other side. At the time of the taking on July 14, 2000, the two residential apartments on the second floor were vacant. Firehouse Pizza had been in operation at the subject property for seventeen years, although on a month to month lease. The plaintiffs, Vincenzo and Valerie Miceli, had owned and operated the Roly Poly Bakery on the subject premises for approximately twenty five years. The Micelis purchased the subject building in 1986 and continued the operation of the bakery on the premises.
Docket No. CV 00 0503028 is a taking of a parcel of land known as 634-640 Main Street (634 Main Street) on July 7, 2000. 634 Main Street adjoins 648 Main Street. 634 Main Street contained 6394 square feet of land with a one — three story, vacant, and formerly mixed use facility. This building was originally constructed in 1886 and contained 4578 square feet of gross building area. The Micelis, partners in the defendant Bakery Place Limited Partnership (Bakery), purchased this property under the partnership name on November 26, 1985 for $55,000. The Micelis purchased this property to expand their bakery on the adjoining parcel. The building at 634 Main Street was vacant at the time of purchase. Shortly after purchasing 634 Main Street, Bakery hired Thomas A. Whaples, an architect, at a cost of $11,500, to develop proposed plans to renovate the building for the expansion of the bakery. Bakery hired a contractor, G W Construction Company, at a contract price of $6320, to gut the building in preparation for the renovation of the building. The contractor removed the plaster walls, bearing walls, CT Page 355 staircases and ceilings leaving the studs in the building. The contractor also removed the plumbing, heater and water meter, excavated the basement floor and boarded up the building, leaving the building in broom swept condition. There is no indication that the contractor dealt with the issue of asbestos as part of the interior demolition. We assume that if asbestos was an issue in the interior demolition, the cost of removal would have been included in the demolition charge of $6320. The defendant Bakery did nothing with the property after it was boarded up because of the ill health of Vincenzo Miceli. The property was in this condition when taken by the state.
We note that the assessor's street card attached to the state's appraisal report (Plaintiff's Exhibit D in 0503028) shows that the New Britain assessor revalued the subject property on October 1, 1995, and determined that the fair market value of this property was $37,840. Bakery paid real property taxes to the City based upon that determination of fair market value for the next five years. The street care listed an indicated income value of $80,300. Using the cost approach, determined that the value of the land as vacant was $27,550 and the building $10,290 for a total value of $37,840. The City used the cost approach at $37,840, not the income approach at $80,300, to determine the fair market value of the subject property. The assessor's street card showed that the building in 1988 was uninhabitable and therefore incapable of producing income. This condition continued up to the time when the city conducted its city-wide revaluation of properties on October 1, 1995, and this same condition continued until the date of taking. We conclude that the city's valuation of the building of $10,290, as of the 1995 revaluation, took into account the existing condition of the property.
Bakery's appraiser, Matthew Welinsky, arrived a fair market value of the subject 634 Main Street property, as of February 22, 2000, at $5,000 even though the taking date was July 14, 2000. Welinsky found the highest and best use of 634 Main Street was for assemblage purposes after the demolition of the building, or for shell utilization where the interior of the building is rehabilitated. Welinsky focused on the vacant land approach to value. He found three comparable sales to arrive at fair market value of the vacant land at $13,000. This is the same value found by the state's appraiser, John W. Nitz, who, in addition to other sales, used the same two comparables Welinsky used. Nitz concluded in his appraisal report that 634 Main Street had a negative value of minus $4000, and for taking purposes recommended a minimum payment of $500. The taking price paid by the state for this property was one dollar. The difference in the values by Welinsky and Nitz arises from a dispute over demolition cost at the time of taking. The environmental cost issue raised by the state did not specifically arise at the time of the taking CT Page 356 but resulted from the demolition of the building by the state, which occurred in June, 2001, almost a year after the taking.
The defendants' appraiser, Welinsky, concluded that the highest and best use of the subject would be as vacant land, and therefore considered the cost to demolish the building on the land. Using the highest and best use of the subject to be vacant land, Welinsky, referring to the Marshall Valuation Service on demolition costs, concluded that the cost to remove the building would be $8000. Welinsky had experience as the manager of the demolition of a similar building in a town adjacent to New Britain and found those costs to be comparable to the cost to demolish the subject building. Welinsky deducted the $8000 cost of demolition from his value of the land at $13,000 and arrived at the fair market value of $5000. Nitz, the state's appraiser, used the same Marshall Valuation Service as Welinsky but arrived at a demolition cost of $17,096. Deducting the demolition cost of $17,096 from the land value of $13,000, Nitz found the fair market value of the subject to be minus $4000.
Nitz based his demolition cost of $17,096 on two sources, Marshall Valuation Service and the demolition cost estimates of competitive properties. Nitz's demolition costs included the demolition of the building and the asbestos removal costs. Welinsky, on the other hand, took into account that the building had been substantially gutted by the owner with substantial material removed, as we have previously noted, and therefore considered the cost of removal to be substantially below Nitz's removal cost. Welinsky also took into account his experience as a manager for the demolition of a building in a neighboring town. Welinsky concluded that the demolition costs for the subject would be $7000. Although Welinsky did not specifically know that asbestos was present in the building, he assumed, based upon his experience in demolition, that some asbestos would be present in the subject building. Welinsky therefore added an additional cost of $1000 to account for the asbestos removal in the demolition process and arrived at a total cost to demolish at $8000.
The state offered invoices from the demolition of the structure on 634 Main Street, almost a year after the taking, showing the state's cost of demolition and backfilling, plus invoices showing the cost of the removal of asbestos on the subject property. We sustained an objection to the introduction of these invoices through Edward Plimpton, a senior consulting engineer for an environmental company who had reviewed the invoices, because he had not inspected the building before its demolition and had no knowledge about the actual work of demolition. Admitting these invoices into evidence would have denied Bakery the opportunity to conduct an effective cross examination regarding the work represented by CT Page 357 the invoices, which would have been crucial to the issue of the relevancy of the cost of remediation at the time of taking. The court allowed Plimpton to testify that his review disclosed that the state paid $35,208.67 for the demolition and $22,334.13 for the removal of asbestos for a total cost of $57,542.80. Plimpton did not visit, inspect or view the property, much less view the inside of the subject property, and therefore relied on reviewing the invoices for his determination of the cost of the demolition and the asbestos removal. The state's appraiser, Nitz, relied on information given to him that the building at 634 Main Street had been gutted and did not go inside the building to verify its condition.
In reviewing the evidence in this case, we note that the appraisal reports for Bakery and the state had been exchanged in preparation for the trial on Bakery's appeal. One week before the date of this trial, the state disclosed that it would present Plimpton and claim remediation costs in this condemnation proceeding. The defendant, Bakery, filed a motion in limine to exclude Plimpton's testimony and the introduction of the invoices to support his claim of remedial damages to offset any payment to the plaintiffs. We denied the motion in limine to prevent Plimpton from testifying because of our consideration for Public Act No. 01-75 and the holding in Northeast Ct. Economic Alliance, Inc. v. ATCPartnership, 256 Conn. 813, 776 A.2d 1068 (2001), which require the court to consider remediation costs in a condemnation proceeding. Neither Welinsky, Nitz or Plimpton made any credible contribution regarding the existence of asbestos or the extent of asbestos in the building. From the presentation of evidence, we can assume the presence of asbestos in the building, but cannot determine the extent of the asbestos in the building. Our general experience is that asbestos insulation used to insulate heating ducts in older buildings may be encapsulated to prevent harm from asbestos as an alternative to removal.
We have reviewed the determination by both appraisers of the highest and best use of the subject property, which was to demolish the building and value the subject as vacant land. We note that neither Welinsky or Nitz used the figures for demolition and remediation costs presented by Plimpton based upon his review of the invoices of the demolition company. Based upon our analysis of the facts in this case, we decline to accept the highest and best use as presented by Welinsky and Nitz. Miceli intended to renovate the building at 634 Main Street to expand his bakery business, which he had been operating for over twenty-five years. Miceli purchased the adjoining property at 634 Main Street in 1985 for the purpose of expanding the bakery business. As stated above, Miceli, as a partner in Bakery, had engaged an architect and a contractor to design the renovation and gut the building. Given the state's cost of remediation of CT Page 358 $57,542.80 that it seeks to offset from its award to Bakery, we find it more credible to maximize the value of the building for Bakery to encapsulate whatever asbestos existed on the premises rather than demolish the premises at a substantial loss. We note the cost of encapsulation is minimal compared to the cost of asbestos removal. (See Defendant's Exhibit 5 in 0503028, Marshall Valuation Service on demolition and removal of hazardous material.) Since neither appraiser valued the subject property with the existing building, the only credible evidence that we have on the valuation of the property with the existing building is the valuation by the City of New Britain for tax purposes. This value, upon which the city had been taxing Bakery since 1995, was $27,550 for the land and $10,290 for the building for a total value of $37,840. We recognize that our selection of the highest and best use of the subject is at odds with the highest and best use selected by the state. However, the state did not purchase the subject property as a willing buyer but rather with the intention of demolishing the building. Bakery was not limited to the demolition of the building as was the state. Bakery had a choice to make use of the property in such a way that would give it the highest value, and this use is what it intended when it purchased the property. Choosing the highest and best use that produces the greatest value, rather than choosing a highest and best use that produces a negative value, is in line with the commonly acceptable use of the term highest and best use. United Technologies Corp. v. EastWindsor, 262 Conn. 11, 25, ___ A.2d ___ (2002).
"A property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and actual value. . . . [U]nder the general rule of property valuation, fair [market] value, of necessity, regardless of the method of valuation, takes into account the highest and best value of the land. . . . A property's highest and best use is commonly defined as the use that willmost likely produce the highest market value, greatest financial return,or the most profit from the use of a particular piece of real estate." (Citations omitted, emphasis in original; internal quotation marks omitted.) United Technologies Corp. v. East Windsor, supra, 262 Conn. 25.
The state's taking for highway purposes was a forced sale. Our purpose here is not to find the value of the property at a forced sale, but rather to determine the value of the premises on the basis of its fair market value, as our courts have defined this term. See Robinson v.Westport, 222 Conn. 402, 405, 610 A.2d 611 (1992). "The owner of land taken by condemnation is entitled to be paid just compensation. The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. In determining market value, it is proper to consider all CT Page 359 those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land. The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum uses." (Citations omitted; internal quotation marks omitted.) Id.
Our finding of fair market value of 634 Main Street is $37,840, which is the value placed upon the subject property by the New Britain assessor as the property existed at the time of the condemnation. The issue of remediation would come into play only if the property had not been taken. If the property had not been taken, then the existence of asbestos would have been a factor to consider in the course of remodeling the building. In the valuation of 634 Main Street, we have taken into consideration Public Act No. 01-75, which requires us to consider environmental remediation costs in assessing market value, and find that the remediation costs, as presented by the state, are not relevant or credible in the determination of the fair market value of the subject premises at the time of taking on July 14, 2000.
We now turn to the valuation of 648 Main Street. Welinsky arrived at a fair market value of 648 Main Street of $115,000, using the income capitalization approach. Although Welinsky used the comparable sales approach to arrive at a value between $50,000 and $75,000, he was of the opinion that with an active real estate market there were only several sales comparable to the subject. For this reason, Welinsky relied upon the income approach to determine the fair market value. Nitz found that the fair market value of 648 Main Street was $89,000 using the income capitalization approach, and $68,000 using the sales comparison approach. Nitz took the average of the two to arrive at $78,000 as the fair market value of the subject. The New Britain assessor valued the subject property on October 1, 1995 at $84,700 using the income approach. The subject property is located in an area of New Britain that has been in transition showing deteriorating residential apartment and mixed-use buildings in the neighborhood as factors affecting values and rent. (See Plaintiff's Exhibit C in 0503209, p. 13.) With the steady flow of income to the subject property, we consider the income approach to value to be the most appropriate. Both appraisers considered the highest and best use of the subject to be a mixed use facility. We agree. The income to the subject property was steady, given the long history of the occupancy by the restaurant and the bakery. We therefore agree with Welinsky that the discounted cash flow method of determining value is a credible method to use in this case. We have examined the appraisers' comparable rents, expense figures, and their vacancy and collection factors and consider Welinsky's use of the discounted cash flow method to CT Page 360 arrive at a value of $115,000, to be the most credible. We therefore conclude that the fair market value of 648 Main Street, as of the date of taking, was $115,000.
Accordingly, as to Docket No. CV 00 0503028, 634 Main Street, judgment may enter in favor of the defendant, Bakery Place Limited Partnership, in the amount of $37,840, less the sum of $1.00 paid by the state plus statutory interest at the rate of 10% as provided in General Statutes § 37-3a, from the date of taking. As to Docket No. CV 00 0503209, 648 Main Street, judgment may enter in favor of the defendants, Vincenzo Miceli and Valerie Miceli, in the amount of $115,000, less the amount of $78,000 previously paid by the state, plus statutory interest at the rate of 10% as provided in General Statutes § 37-3a, from the date of taking. We also award appraisal fees to Bakery Place Limited Partnership in the amount of $1000, plus costs, and award appraisal fees to the Micelis in the amount of $1000 plus costs.
 ___________________ Arnold W. Aronson Judge Trial Referee
CT Page 361