# AETNA LIFE INSURANCE COMPANY *v.*
# CITY OF MIDDLETOWN
## (AC 22826)

Foti, West and Peters, Js.

Argued February 18—officially released May 27, 2003

*Barbara A. Frederick*, with whom were *Trina A. Solecki*, city attorney, and, on the brief, *Robert M. DeCrescenzo*, for the appellant-appellee (defendant).

*Marjorie S. Wilder*, with whom were *Julie A. Morgan* and, on the brief, *Elliott B. Pollack*, for the appellee-appellant (plaintiff).

*Opinion*

FOTI, J. The defendant, the city of Middletown, appeals from the judgment of the trial court rendered in accordance with its decision in this real estate tax appeal brought pursuant to General Statutes § 12-117a[1]

[1] General Statutes § 12-117a provides in relevant part: "Any person . . . claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. . . . The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

by the plaintiff, Aetna Life Insurance Company (Aetna). Aetna has filed a cross appeal. The city claims that the court should have dismissed Aetna's property tax appeal because the city believes Aetna failed to meet its threshold burden of proving that the city's appraiser had overvalued the subject property. On its cross appeal, Aetna claims that although the court properly determined that the city had overvalued the subject property, the court nevertheless improperly determined the property's correct value. As to both the appeal and cross appeal, we affirm the judgment of the court.

The record reveals the following facts and procedural history. The subject property is Aetna's corporate facility at 1000 Middle Street in Middletown, which consists of 263 acres of land[2] improved with a 1,490,000 square foot main building and a 120,000 square foot computer center that is connected to the main building by a tunnel, as well as a 7570 square foot maintenance building and two parking structures totaling approximately 215,000 square feet. The construction of the facility began in March, 1981, and was completed on a "fast track" basis in April, 1984. That "fast track" construction resulted in many change orders and other construction cost increases. The total historical cost of the land and the improvements was $167,261,318. The main building consists of three, seven story core sections or "pods" that surround a large, central skylit atrium. The design was intended to segment the extremely large building into sections and to provide light to interior portions of the building. The main building is used primarily for office space, but it also contains many special features for the use of the approximately 5000 employees working there.[3]

[2] In 1980, Aetna purchased 269.7 acres of undeveloped land in Middletown for $5,448,000. In 1982, Aetna conveyed 6.7 acres to the city, leaving a balance of approximately 263 acres.

[3] The building contains a health and fitness center, a 700 seat auditorium, a 115 seat lecture hall, eighteen conference rooms, a convenience store, a hair salon, executive and employee dining areas, a cafeteria with seating

In 1985, Aetna entered into a sale-leaseback transaction with the trustees of Middletown Trust (trust). Specifically, Aetna first leased to the trust 54.49 acres of the subject property on which sits all of the property's improvements for a term of twenty-five years with an option to extend the lease for ten additional, consecutive five year terms. Along with granting the lease of the 54.49 acres of land, Aetna sold the improvements to the trust for $225,000,000. Aetna then took back a sublease of the 54.49 acres together with a lease of the improvements.[4] Aetna retained the obligation to pay all property taxes associated with the leased property.

As of the October 1, 1987 grand list, the city's assessor set the total fair market value of the subject property at $250,665,000. Reduced property tax assessments pursuant to an earlier incentive agreement ended with the October 1, 1990 grand list.[5] Subsequently, Aetna paid,

for 2100 persons and a large granite fountain in the atrium. In addition to paved roads and landscaping, the subject property also has covered walkways, an outdoor recreation area with two softball fields and a jogging-hiking trail, as well as a helipad.

[4] As the court noted in its memorandum of decision, "[t]he result of this transaction . . . was that the trust owned the improvements with a stepped-up basis from the historical building cost of $161,846,318 to $225,000,000, together with a lease of the 54.49 acres. Aetna ended up owning the balance of the 263 acres of land with a reported gain of $61,500,000 on the sale of the improvements to the trust."

[5] The city had entered into an incentive development agreement with Aetna in 1981. The incentive agreement provided that as of the October 1, 1987 grand list, on the basis of an agreed on fair market value of $6,714,285, the assessed value of the land would be $4,700,000. The incentive agreement further provided that the improvements to the property would be assessed at 40 percent of the agreed on value and that this assessment would run for seven years from the date of the grand list following the issuance of the certificate of occupancy. A final certificate of occupancy for the facility was issued on August 28, 1984. The parties agreed that the fair market value of the improvements would be $243,950,800. As of October 1, 1987, the total valuation for the subject property under the terms of the agreement was $250,665,085.

The city later completed a statutorily mandated revaluation of all property in the city for the October 1, 1987 grand list. To lessen the impact of the revaluation on its property owners, the city approved a phase in of the new

without protest, the property taxes assessed on the subject property for the grand lists of October 1, 1991 to 1994. In May, 1996, however, Aetna appealed to the city's board of assessment appeals (board), challenging the city's valuation of the subject property and the assessments for the grand lists of October 1, 1995, 1996 and 1997.[6] The board dismissed the appeal and Aetna sought review of the board's decision from the court pursuant to § 12-117a. Contrary to the board's decision, the court concluded that the city, in fact, had overvalued Aetna's property by $17,133,451 and that the true and actual value of the subject property as of the October 1, 1987 grand list should have been $233,531,549.[7] This appeal and cross appeal followed.

Before addressing the merits of the parties' claims, we first set forth the well settled legal principles under-

assessments for property tax purposes. For the October 1, 1987 grand list, property was taxed on 30 percent of the property's value. The phase in increased yearly by 10 percent increments until 1991, at which time all property in the city was assessed at 70 percent of fair value. Therefore, as of the October 1, 1991 grand list, the subject property no longer was subject to the incentive agreement, but was instead assessed at 70 percent of the valuation set by the city assessor as of October 1, 1987.

[6] Originally, the appeal was taken only from the 1995 assessment, but Aetna later amended the appeal to include the 1996 and 1997 grand lists.

[7] We note that the court's memorandum of decision contains an apparent typographical error in the summation of the court's computation of the total fair market value, which total should have read $233,351,549 not $233,531,549. The consequence of that error is a $180,000 overstatement of the true and actual value as determined by the court. This error was then, unfortunately, carried over into the judgment. Neither party raised that issue on appeal in either their appellate briefs or at oral argument. Because the error does not affect our disposition of the claims as raised on appeal, we affirm the judgment and leave it to the parties to seek a correction of that clerical error. See *Cusano* v. *Burgundy Chevrolet, Inc.*, 55 Conn. App. 655, 659–60, 740 A.2d 447 (1999) (General Statutes § 52-212a, Practice Book § 17-4 do not bar court from opening judgment at any time to correct clerical error), cert. denied, 252 Conn. 942, 747 A.2d 519 (2000); see also *Goldreyer* v. *Cronan*, 76 Conn. 113, 115–16, 55 A. 594 (1903) ("[o]ver its recorded judgments the court may exercise . . . the power to correct and amend the record so that it shall truly show what the judicial action in fact was").

lying a § 12-117a tax appeal, as well as our applicable standard of review. "In § 12-117a tax appeals, the trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. . . . Once the taxpayer has demonstrated aggrievement by proving that its property was overassessed, the trial court [will] then undertake a further inquiry to determine the amount of the reassessment that would be just. . . . The trier of fact must arrive at [its] own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value . . . .

"We review the trial court's conclusion in a tax appeal pursuant to the well established clearly erroneous standard of review. Under this deferential standard, [w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 22–23, 807 A.2d 955 (2002).

Keeping those principles in mind, we now turn to our resolution of the claims raised in the present appeal.

## I

The city's sole claim on appeal is that the court should have dismissed Aetna's appeal because Aetna failed to satisfy its burden of proving that the city's appraiser had overvalued the subject property.[8] We disagree.

The city argues that the only evidence of valuation that Aetna offered at trial was the expert testimony of Aetna's appraiser, Arnold J. Grant, and that the court rejected each of the three intermediate determinations of value that Grant utilized in reaching his final conclusion that the correct value of the subject property was $167,700,000. The city further argues that the only other evidence before the court of the true and actual value of the subject property was the city assessor's original valuation of $250,665,085 and the $260,000,000 valuation made by the city's expert, John Leary. The city concludes that the evidence before the court that the property was overvalued was therefore insufficient to satisfy Aetna's burden of proof and that the court should have dismissed the appeal as a matter of law. Specifically, the city asserts in its principal brief: "The trial court's findings regarding Aetna's evidence therefore establish, as a matter of law, that Aetna failed to meet its threshold burden of proving an overassessment." That assertion, however, is incorrect.

The city is correct that the only evidence of valuation that Aetna presented at trial was the testimony of its expert, Grant. After cross-examination of Grant, at the close of Aetna's case-in-chief, if the city believed, as it now claims, that Aetna's evidence failed to establish by a preponderance of the evidence that there was an

---

[8] Although the court's memorandum of decision does not contain an express finding as to whether the plaintiff met that burden, on the basis of its memorandum of decision and its conclusion that the subject property was in fact overvalued, one reasonably can infer, and we do so, that the court answered that question in the positive.

overvaluation, the city could have sought a dismissal pursuant to Practice Book § 15-8.[9] See *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 752 n.6, 699 A.2d 81 (1997). It chose not to do so. Instead, the city elected to present the court with its own witnesses and other evidence regarding what it believed to be the proper valuation of the subject property. Although Aetna had the burden of proof as to the court's determination whether the city had overvalued the subject property; see *United Technologies Corp.* v. *East Windsor*, supra, 262 Conn. 22; *Ireland* v. *Wethersfield*, 242 Conn. 550, 556, 698 A.2d 888 (1997); *Xerox Corp.* v. *Board of Tax Review*, 240 Conn. 192, 204, 690 A.2d 389 (1997); the city's characterization of the evidence that the court could have considered in making that determination is misguided.

The city's claim on appeal is similar to one raised in *Sears, Roebuck & Co.* v. *Board of Tax Review*, supra, 241 Conn. 749. In that case, the defendant town also claimed that the plaintiff had failed to meet its burden of proof, arguing that the court had not credited the testimony of the plaintiff's principal witness concerning overvaluation of the subject property, but instead improperly relied on the opinion of the town's expert, whose testimony the town conceded explicitly supported the court's finding of overvaluation. Id., 755. In rejecting that argument, our Supreme Court noted: "Because a tax appeal is heard de novo, a trial court judge is privileged to adopt *whatever testimony he reasonably believes to be credible*. . . . This principle applies not only to the trial court's determination of

[9] Practice Book § 15-8 provides: "If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has produced evidence and rested his or her cause, the defendant may move for judgment of dismissal, and the judicial authority may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made."

the true and actual value of taxable property, but also to its determination of whether the plaintiff has satisfied the burden of establishing overvaluation." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 755–56.

In this case, the court, therefore, in determining whether Aetna had met its burden of showing an overvaluation of the subject property, properly could have considered all the evidence presented at trial, including the testimony of Leary and any other evidence presented by the city. "Because the burden of proving overvaluation rested on the plaintiff, the [city] was under no obligation to submit expert evidence in support of its valuation. Having submitted such evidence, however, the [city] cannot circumscribe its significance or prevent the trial court from relying on it for substantive purposes." Id., 756.[10]

[10] We note that any reliance by the defendant on the Supreme Court's holding in *Ireland* v. *Wethersfield*, supra, 242 Conn. 550, decided a few weeks after *Sears, Roebuck & Co.*, is misplaced, as the holding in *Ireland* is inapplicable to the present action. *Ireland* addressed whether a town or city has any burden to produce evidence in support of its valuation of a taxpayer's property when that valuation is challenged.

Our Supreme Court stated: "If the trial court finds that the taxpayer has failed to meet his burden . . . the trial court may render judgment for the town on that basis alone. On appeals by the taxpayer, we have regularly affirmed such judgments without a showing that the town adduced affirmative evidence sufficient to demonstrate that the assessor's determination of market value was not unjust. . . .

"If, however, the trial court finds that the taxpayer . . . has demonstrated an *overvaluation* of his property, the trial court must then undertake a further inquiry to determine the amount of the reassessment that would be just. . . . It is in the context of such cases, namely, cases in which the taxpayer has met his initial burden of proving overvaluation, that we have noted the trial court's discretionary authority to find value and have declined to assign presumptive validity to the town's assessment figure." (Citations omitted; internal quotation marks omitted.) Id., 557–58.

*Ireland* is distinguishable from the present case because the court in this case did not explicitly find that Aetna had failed to meet its burden of proof. See footnote 8. Despite the city's arguments implying the contrary, therefore, it would have been improper for the court to give presumptive validity to the city's valuation because the court was required to make a de novo

Examination of the court's memorandum of decision reveals that it did not accept fully the valuation of either party's expert. It certainly was a proper exercise of the court's discretion to credit whatever testimony it reasonably believed to be credible. Although the court rejected some of Grant's analysis, it also agreed with him in part. For example, the court credited Grant's testimony that the subject property was one of the largest office buildings in the state and that comparable structures were seldom for sale on the open real estate market. Consequently, the court found that there were, in effect, no appropriate comparable sales or comparable market rents because other properties either were not close in size, were multitenant buildings or the leases were relatively short term compared with the Aetna lease. Accordingly, the court agreed with Grant's analysis that the sales comparison and income capitalization approaches to valuation were of limited use in determining fair market value and that the most credible approach to valuing the subject property was, as Grant suggested, the cost approach.

In considering a cost approach to valuing the subject property, the court chose to credit Leary's reproduction cost approach over Grant's replacement cost approach[11]

determination of value, considering all the evidence of valuation that was presented.

[11] The court noted the difference between replacement cost and reproduction cost in its memorandum of decision: "The cost to construct an improvement on the effective appraisal date may be developed as the reproduction or replacement cost of the improvement. The theoretical base for the cost approach is reproduction costs, but replacement cost may also be used. An important distinction must be made between the terms.

"Reproduction cost is the estimated cost to construct, at current prices as of the effective appraisal date, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies, and obsolescence of the subject building.

"Replacement cost is the estimated cost to construct, at current prices as of the effective appraisal date, a building with utility equivalent to the building being appraised, using modern materials and current standards,

and, in general, adopted Leary's computations, agreeing that the reproduction cost for the subject property without the computer center as of October 1, 1987, was $207,839,870. The court, however, rejected Leary's selection of 7.5 percent to 12.5 percent as the proper measure of entrepreneurial profit in favor of Grant's selection of 2 percent or $4,156,797. Additionally, the court credited Grant's analysis of the cost of the land at $40,000 per acre to be more credible than Leary's value of $60,000 per acre, resulting in a total value for the subject land of $10,520,000. Accepting Leary's $9,650,353 depreciation deductions and adding in a similarly calculated value of $20,485,235 for the computer center, the court reasonably determined, solely on the basis of the evidence presented, that the true and actual value of the subject property was $233,531,549 or $17,133,451 less than the city's valuation.

The city has provided no legal support, nor do we find any, for its implicit proposition that a court, in considering evidence of valuation, must either wholly reject or wholly adopt the analysis of an expert witness. Although Leary's ultimate conclusion as to valuation did not directly support a finding of overvaluation as did the town's expert in *Sears, Roebuck & Co.* v. *Board of Tax Review*, supra, 241 Conn. 749, the court, nevertheless, was free to accept and reject any portion of his or Grant's analyses in reaching its conclusion that the city had in fact overvalued the subject property. Therefore, on the basis of our review of the record, we conclude that the court properly determined that the plaintiff had met its burden of showing that the city's assessor had overvalued the subject property and that such a finding was legally and logically correct and supported by the evidence before the court.

design, and layout. Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992) pp. 318–19." (Internal quotation marks omitted.)

## II

We next address Aetna's cross appeal, which challenges the court's determination of the true and actual value of the subject property. In its principal brief, Aetna generally claims that in valuing the subject property, the court "utilized the incorrect legal standard." Specifically, Aetna claims that the court improperly utilized a reproduction cost approach instead of a replacement cost approach, and determined the subject property's "use value" to Aetna and its employees rather than its "fair market value." Mindful of our deferential standard of review, we find Aetna's arguments unpersuasive and conclude that the court's determination of the value of the subject property was not clearly erroneous.

Aetna first claims that the court improperly utilized a reproduction cost approach instead of a replacement cost approach in determining the fair market value of the subject property. Aetna makes the following argument in support of that claim. Because Aetna leased the subject property from the trust, it is rental income property, and its valuation is governed by General Statutes § 12-63b.[12] That statute provides that when an assessment on the basis of comparable sales is not feasible, the city's assessor or board of assessors should conduct an appraisal, "which shall include *to the extent*

---

[12] General Statutes § 12-63b provides in relevant part: "Valuation of rental income real property. (a) The assessor or board of assessors in any town, when determining the present true and actual value of real property as provided in section 12-63, which property is used primarily for the purpose of producing rental income . . . and with respect to which property there is insufficient data in such town based on current bona fide sales of comparable property which may be considered in determining such value, shall determine such value on the basis of an appraisal which shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property. . . ."

*applicable* with respect to such property, *consideration* of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property. . . ." (Emphasis added.) General Statutes § 12-63b (a). The statute does not mention reproduction cost as one of the appraisal methods that the court must consider. Therefore, Aetna contends that the court should not have adopted Leary's reproduction cost approach, but instead should have utilized Grant's replacement cost approach. We disagree.

The court's ultimate goal is to establish the true and actual value of the subject property and, "[o]n appeal, the scope of our review is limited because it is a question of fact for the trier as to whether the method used for valuation appears in reason and logic to accomplish a just result." *First Bethel Associates* v. *Bethel,* 231 Conn. 731, 738, 651 A.2d 1279 (1995). Section 12-63b provides guidance to the appraiser and, thus, to the court in determining that value. Id. It only requires, however, that the court give *consideration* to the enumerated methods to *the extent applicable with respect to such property.* It does not mandate that a particular method must be utilized or otherwise serve to limit the court's discretion to choose the method that it believes will result in the fairest approximation of the subject property's value. It is clear from the court's memorandum of decision that it gave serious consideration to several methods of valuation in reaching its final conclusion, including the comparable sales, income capitalization, reproduction and replacement cost approaches.

After making a well reasoned determination, largely on the basis of the opinion of Aetna's own expert, that no comparable properties existed in which to compare sales or market rent, the court chose the cost approach

as the best method for valuing the subject property. It gave ample consideration to the replacement cost approach but, ultimately, given the particular circumstances presented in this case, it chose to adopt reproduction cost as the fairest and most accurate method of determining the subject property's value under the cost approach. "We do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. Rather, we focus on the [court's] conclusion . . . as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Internal quotation marks omitted.) Id., 744. We conclude that the court's decision to utilize a reproduction cost approach is not clearly erroneous because it is supported adequately by the facts and is not contrary to § 12-63b (a).

Aetna next claims that the court did not determine "fair market value" as required by General Statutes § 12-63,[13] but rather determined the subject property's value wholly on the basis of its value to Aetna and its employees. Despite Aetna's arguments to the contrary, the record and the court's memorandum of decision do not support that claim.

In determining the true and actual value of real property, the court must arrive at its own conclusion as to value by "weighing the opinion of the appraisers, the

---

[13] General Statutes § 12-63 (a) provides: "The present true and actual value of land classified as farm land pursuant to section 12-107c, as forest land pursuant to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be if such open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. The present true and actual value of all other property shall be deemed by all assessors and boards of assessment appeals to be the fair market value thereof and not its value at a forced or auction sale."

claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value including his own view of the property." (Internal quotation marks omitted.) *Konover* v. *West Hartford*, 242 Conn. 727, 735, 699 A.2d 158 (1997). Excluding farm, forest and open space land, the true and actual value of real property for the purpose of taxation is determined on the basis of its "fair market value . . . ." General Statutes § 12-63 (a). Section 12-63, however, does not provide a definition of fair market value or a method for its calculation. We therefore look to our case law.

Our courts often have defined fair market value as the price that would result from the fair negotiations of a willing seller and a desirous buyer. *Uniroyal, Inc.* v. *Board of Tax Review*, 174 Conn. 380, 390, 389 A.2d 734 (1978). That method of valuation, of course, presumes that a reasonable market for the property exists. "Where this method is unavailable, however, other means are to be found by which to determine value. . . . A variety of such alternative methods for calculation of 'true and actual value' have been approved by [our Supreme Court]: use of the cost of reproduction with an adjustment for depreciation . . . use of the original property cost less depreciation . . . and the capitalization of actual income approach . . . ."[14] (Citations omitted.) Id., 386. "A property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and

---

[14] "At least four methods exist for determining the fair market value of property for taxation purposes: (1) analysis of comparable sales; (2) capitalization of gross income; (3) capitalization of net income; and (4) reproduction cost less depreciation and obsolescence. . . . Each of these is an approved method of ascertaining the actual value of real estate for purposes of taxation." (Citations omitted; internal quotation marks omitted.) *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, 220 Conn. 335, 342, 597 A.2d 326 (1991).

actual value. . . . The highest and best use conclusion necessarily affects the rest of the valuation process because, as the major factor in determining the scope of the market for the property, it dictates which methods of valuation are applicable." (Citations omitted.) *United Technologies Corp.* v. *East Windsor*, supra, 262 Conn. 25–26.

In reaching its conclusion as to valuation, the court considered, along with other evidence, Grant's and Leary's testimony and written reports as to the highest and best use of the subject property, and the approaches to valuation that flowed from those opinions. The parties agreed that the highest and best use of the subject property was a continuation of its present use; they differed, however, in how they characterized that use. Grant's analysis presumed a present use comparable to that of a typical office building. Grant suggested that, as such, the property contained design flaws and inefficiencies that limited the functional utility of the subject property and, consequently, acted to lessen its fair market value. For example, the main building has large corridors and excessive common space as well as numerous special amenities that are absent from many typical office buildings. In contrast, Leary based his analysis on the subject property's continued use as a corporate headquarters, not as an inefficient office building. Leary's opinion was that many of the design features and extras that Aetna chose to incorporate in its original design are typical for a corporate headquarters type facility.

Contrary to Aetna's argument that the court excluded market evidence and ignored market objectives, the court considered Grant's market based inefficiency theory and specifically chose to reject it. That was consistent with the court's adoption of Leary's opinion that "the highest and best use is a continuation of the present use by Aetna as a corporate headquarters." We refuse

Aetna's invitation to read into that statement of highest and best use the court's intention to value the subject property exclusively on the basis of its "use value" to Aetna and Aetna's employees because such an interpretation is inconsistent with the court's decision when read as a whole. See id., 25–28 (approving trial court's finding that subject property's highest and best use was " 'its continued use . . . as presently used by [the plaintiff]' "). Aetna's use of the subject property and its value to Aetna are clearly representative of the subject property's general market value as a corporate headquarters and were considered properly by the court along with all the additional relevant evidence.

Aetna further supports its argument by noting that the court recognized Aetna's choice to "fast track" the construction, which increased the property's construction cost due to cost overruns and the need to redesign aspects of the project. Aetna argues that in reproducing the subject property, a corporation likely would not duplicate those costs and that the court improperly neglected to account for that in making its determination of value. Aetna, however, has not provided us with any binding authority that holds that a court must account for such "functional obsolescence" or that a failure to do so is clearly erroneous. Further, there was evidence that Leary's reproduction cost analysis, on which the court relied in part for its calculation, compared both the actual construction costs and the original contract plans, and found no significant increase in the overall cost per square foot despite the change orders. We therefore conclude that the court's determination of the subject property's true and actual value as of the October 1, 1987 grand list reflects its fair market value, does not ignore relevant market data, and is legally correct and supported by the facts.

The judgment is affirmed.

In this opinion the other judges concurred.