## MOTIVA ENTERPRISES, LLC *v.* TOWN OF STRATFORD ET AL.*

Superior Court, Judicial District of Fairfield
File No. CV-05-4007824-S

Memorandum filed August 27, 2007

*David L. Weiss*, for the plaintiff.

*Michael S. Casey*, for the defendants.

ARNOLD, J. The plaintiff, Motiva Enterprises, LLC, has filed an appeal from a tax assessment by the defendant town of Stratford (town) regarding the plaintiff's property located in the upper boundary of the south end of the town, in the area known as "The Meadows." The town assessed the subject property at $13,750,700 for the revaluation date of October 1, 2004. Thereafter, the plaintiff appealed from the decision to the defendant board of assessment appeals (board). On April 1, 2005,

---

* Affirmed. *Motiva Enterprises, LLC* v. *Stratford*, 111 Conn. App. 357, 961 A.2d 425 (2008).

the board denied the plaintiff's request pursuant to General Statutes § 12-111.[1] On April 5, 2005, the plaintiff

[1] General Statutes § 12-111 provides: "Appeals to board of assessment appeals. (a) Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of a lease to pay real property taxes and any person to whom title to such property has been transferred since the assessment date, claiming to be aggrieved by the doings of the assessors of such town may appeal therefrom to the board of assessment appeals. Such appeal shall be filed, in writing, on or before February twentieth. The written appeal shall include, but is not limited to, the property owner's name, name and position of the signer, description of the property which is the subject of the appeal, name and mailing address of the party to be sent all correspondence by the board of assessment appeals, reason for the appeal, appellant's estimate of value, signature of property owner, or duly authorized agent of the property owner, and date of signature. The board shall notify each aggrieved taxpayer who filed a written appeal in the proper form and in a timely manner, no later than March first immediately following the assessment date, of the date, time and place of the appeal hearing. Such notice shall be sent no later than seven calendar days preceding the hearing date except that the board may elect not to conduct an appeal hearing for any commercial, industrial, utility or apartment property with an assessed value greater than five hundred thousand dollars. The board shall, not later than March first, notify the appellant that the board has elected not to conduct an appeal hearing. The board shall determine all such appeals and send written notification of the final determination of such appeals to each such person within one week after such determination has been made. Such written notification shall include information describing the property owner's right to appeal the determination of such board. Such board may equalize and adjust the grand list of such town and may increase or decrease the assessment of any taxable property or interest therein and may add an assessment for property omitted by the assessors which should be added thereto; and may add to the grand list the name of any person omitted by the assessors and owning taxable property in such town, placing therein all property liable to taxation which it has reason to believe is owned by such person, at the percentage of its actual valuation, as determined by the assessors in accordance with the provisions of sections 12-64 and 12-71, from the best information that it can obtain, and if such property should have been included in the declaration, as required by section 12-42 or 12-43, it shall add thereto twenty-five per cent of such assessment; but, before proceeding to increase the assessment of any person or to add to the grand list the name of any person so omitted, it shall mail to such person, postage paid, at least one week before making such increase or addition, a written or printed notice addressed to such person at the town in which such person resides, to appear before such board and show cause why such increase or addition should not be made.

"(b) If an extension is granted to any assessor or board of assessors pursuant to section 12-117, the date by which a taxpayer shall be required to submit a written request for appeal to the board of assessment appeals

appealed to the Superior Court, claiming that the town's assessment for October 1, 2004, was grossly excessive, disproportionate and unlawful. This appeal was tried to the court on March 7, 2007. The court heard evidence from the plaintiff's appraiser, Gregg Manzione, MAI, vice president of Nationwide Consulting Company, Inc., located in Glen Rock, New Jersey, and Bruce Burnham, the senior tax representative for Shell Oil Company. The court also heard evidence from the town's appraiser, Peter Vimini, MAI, of Vimini Associates of Bridgeport.

I

## THE SITE

The overall site consists of an irregular shaped parcel, situated on the southwest side of Lordship Boulevard,[2] as well as on the northerly side of Long Island Sound and the northeast side of Johnson's Creek inlet. Eagle's Nest Road is a private roadway-access within the plaintiff's facility. The facility is owner-occupied and is used by the plaintiff as a "tank farm" for petroleum and related storage, and as a distribution center. The total site area equates to 48.35 acres. However, 25.67 acres are located in Stratford, and the remaining acreage is located in the city of Bridgeport. This appeal is limited to the assessment levied by the town on the portion of the plaintiff's facility located in Stratford.

shall be extended to March twentieth and said board shall conduct hearings regarding such requests during the month of April. The board shall send notification to the taxpayer of the time and date of an appeal hearing at least seven calendar days preceding the hearing date, but no later than the first day of April. If the board elects not to hear an appeal for commercial, industrial, utility or apartment property described in subsection (a) of this section, the board shall notify the taxpayer of such decision no later than the first day of April."

[2] There are 637 feet of frontage along Lordship Boulevard in Stratford, which includes the sixty foot width of Eagle's Nest Road, a private access road within the facility.

Primary improvements situated in Stratford consist of seven cylindrical, aboveground welded steel tanks, with two additional steel tanks bisected by the Stratford-Bridgeport boundary line. Tanks range in size from 81,000 to 120,000 barrel capacities used for oil, gas and ethanol storage and distribution. Other improvements associated with the tanks include metal cargo, rack and foam lines and water lines servicing the tanks. There are several steel stairways and short walkways over the line and between the tanks. There are also two vapor recovery tanks reported by the plaintiff to have respective volume sizes of 80,000 and 100,000 cubic feet. These tanks are welded steel and are forty feet in height.

Site improvements consist of a primary central paved access road bordered by chain-link fencing. The roadway extends approximately 1000 feet in Stratford before continuing on into the Bridgeport portion of the plaintiff's site. The roadway is approximately sixty feet in width. The fencing has several swinging gates for access to the tanks. Interior portions of the site consist of dirt and gravel areas, with compartmentalized gravel, with a berm system for spillage and fire safety between the tanks. There is lighting mounted on lamp posts throughout the site.

The plaintiff's overall location located in both Bridgeport and Stratford has primary water frontage, dockage, loading racks and pumping facilities, as well as barge access along and beneath the deepwater channel on the Bridgeport portion of the site. However, the subject portion of the site in Stratford has no usable water frontage. Office and warehouse buildings are also located on the Bridgeport portion of the site and, therefore, are not considered for the purposes of this tax assessment appeal.

The subject site predominately overlooks commercial related uses, including a gasoline station, hotel and

office uses along Lordship Boulevard. It also overlooks industrial uses in the immediate vicinity and Interstate 95 ramps. Long Island Sound and Johnson's Creek inlet are situated to the south, southwest and west. The property is located within 500 feet of a watercourse and, therefore, requires coastal area management (CAM) approval for any future development.[3]

## II

## STANDARD OF LAW

Before addressing the merits of the parties' claims, this court sets forth the well settled legal principles underlying a General Statutes § 12-117a tax appeal.[4] "In

[3] See General Statutes § 22a-90 through § 22a-112, the Coastal Management Act and the coastal site plan review process.

[4] General Statutes § 12-117a provides: "Appeals from boards of tax review or boards of assessment appeals. Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as

§ 12-117a tax appeals, the trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. . . . Once the taxpayer has demonstrated aggrievement by proving that its property was overassessed, the trial court [will] then undertake a further inquiry to determine the amount of the reassessment that would be just. . . . The trier of fact must arrive at [its] own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value . . . ." (Internal quotation marks omitted.) *Aetna Life Ins. Co.* v. *Middletown*, 77 Conn. App. 21, 26, 822 A.2d 330, cert. denied, 265 Conn. 901, 829 A.2d 419 (2003), quoting *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 22–23, 807 A.2d 955 (2002).

to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

A tax appeal is not an administrative appeal in which our courts review the actions of the assessor. See *Kimberly-Clark Corp.* v. *Dubno,* 204 Conn. 137, 144–45, 527 A.2d 679 (1987). The function of the trial court in any municipal tax appeal is to first determine whether the subject property was overvalued, and if it was overvalued, what was the fair market value of the property on the date of the last revaluation. *Konover* v. *West Hartford,* 242 Conn. 727, 734–36, 699 A.2d 158 (1997). It is the plaintiff taxpayer's burden to prove that it was aggrieved because its property was overvalued. *Executive Square Ltd. Partnership* v. *Board of Tax Review,* 11 Conn. App. 566, 571, 528 A.2d 409 (1987).

"Because a tax appeal is heard de novo, a trial court judge is privileged to adopt whatever testimony he reasonably believes to be credible . . . . This principle applies not only to the trial court's determination of the true and actual value of taxable property, but also to its determination of whether the plaintiff has satisfied the burden of establishing overvaluation." (Citations omitted; internal quotation marks omitted.) *Sears, Roebuck & Co.* v. *Board of Tax Review,* 241 Conn. 749, 755–56, 699 A.2d 81 (1997). "[T]he trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as [it] finds applicable . . . ." (Internal quotation marks omitted.) *Krasowski* v. *Fantarella,* 51 Conn. App. 186, 193, 720 A.2d 1123 (1998), cert. denied, 247 Conn. 961, 723 A.2d 815 (1999); see also *Metropolitan District* v. *Burlington,* 241 Conn. 382, 396, 696 A.2d 969 (1997). The trier of fact relies on the appraisals as a foundation from which it builds its analysis of the case. "Valuation is a matter of fact to be determined by the trier's independent judgment." (Internal quotation marks omitted.) *New Haven* v. *Tuchmann,* 93 Conn. App. 787, 795, 890 A.2d 664, cert. denied, 278 Conn. 903, 896 A.2d 104 (2006).

## III

## THE DISPUTE

As noted previously, the town assessed the subject property at $13,750,700 for the revaluation date of October 1, 2004.[5] The plaintiff claims that the true and actual value of the subject property as of October 1, 2004, was $6,104,000 based on the appraisal report and testimony of Manzione of Nationwide Consulting Company, Inc., a licensed real estate appraiser who has performed many oil and gas terminal appraisals over a period of twenty years, including such appraisals in the state of Connecticut.[6] Manzione's valuation was based on the utilization of a comparable sales approach to value.[7] He used the sales comparison approach, concluding that the income approach and cost approach methods of valuation were "not applicable." In addition, the plaintiff offered testimony from Burnham, senior tax representative of Shell Oil Company, regarding (1) the fair market valuation of the Bridgeport portion of the oil and gas terminal, as established by the Bridgeport tax assessor, and (2) that the plaintiff maintained a total asset valuation for the Bridgeport and Stratford

---

[5] At trial, the town claimed that the true and actual value of the Stratford portion of the site, as of October 1, 2004, was $13,250,000 and not $13,750,700.

[6] Manzione is also a partner in Nationwide Petroleum Realty, a brokerage agency dealing with brokerage transactions of petroleum related assets, including oil terminals. Nationwide Petroleum Realty is paid on a commission basis ranging from 5 percent to 10 percent if it brokers a successful sale of a gas and oil terminal. Manzione confirmed that a lower tax assessment would make a property more attractive to a potential buyer.

[7] "At least four methods exist for determining the fair market value of property for taxation purposes: (1) analysis of comparable sales; (2) capitalization of gross income; (3) capitalization of net income; and (4) reproduction cost less depreciation and obsolescence. . . . Each of these is an approved method of ascertaining the actual value of real estate for purposes of taxation." (Citations omitted; internal quotation marks omitted.) *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, 220 Conn. 335, 342, 597 A.2d 326 (1991).

properties in the aggregate of $16 million. The Bridgeport tax assessor, as of October 1, 2004, assessed the Bridgeport portion of the subject site at $8,867,479.

The town's licensed real estate appraiser has experience in appraising numerous properties in the local region, including Stratford. He has conducted appraisals for commercial and industrial properties. He has conducted only two past appraisals on oil and gas terminals within Connecticut, and the last of such appraisals was conducted in the late 1980s. Vimini, in reaching his opinion that the Stratford portion of the plaintiff's site had a market value of $13,250,000, utilized the cost approach for valuation, testifying that the comparable sales method used by Manzione was not the appropriate method of valuation that should be utilized for this site.

IV

FINDINGS

Both the plaintiff and the defendants agree that the highest and best use of the subject property as of October 1, 2004, was its continued use "as improved" as an oil and gas terminal. The issue before the court is what method of an appraisal valuation should be utilized to determine the true and actual value of the subject property as of October 1, 2004.

The court's ultimate goal is to establish "the true and actual value of the subject property . . . ." *Aetna Life Ins. Co.* v. *Middletown,* supra, 77 Conn. App. 33. "[I]t is a question of fact for the trier as to whether the method used for valuation appears in reason and logic to accomplish a just result." *First Bethel Associates* v. *Bethel,* 231 Conn. 731, 738, 651 A.2d 1279 (1995).

"In actions requiring . . . a valuation of property, the trial court is charged with the duty of making an independent valuation of the property involved. . . . [N]o one method of valuation is controlling and . . .

the [court] may select the one most appropriate in the case before [it]. . . . Moreover, a variety of factors may be considered by the trial court in assessing the value of such property. . . . [T]he trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . The trial court has broad discretion in reaching such conclusion, and [its] determination is reviewable only if [it] misapplies or gives an improper effect to any test or consideration which it was [its] duty to regard." (Internal quotation marks omitted.) *Sheridan* v. *Killingly*, 278 Conn. 252, 259, 897 A.2d 90 (2006); *Route 188, LLC* v. *Middlebury*, 93 Conn. App. 120, 124, 887 A.2d 958 (2006).

Courts often have defined fair market value as the price that would result from the fair negotiations of a willing seller and a desirous buyer. *Uniroyal, Inc.* v. *Board of Tax Review*, 174 Conn. 380, 390, 389 A.2d 734 (1978). "That method of valuation, of course, presumes that a reasonable market for the property exists." *Aetna Life Ins. Co.* v. *Middletown*, supra, 77 Conn. App. 35. "Where this method is unavailable, however, other means are to be found by which to determine value. . . . A variety of such alternative methods for calculation of 'true and actual value' have been approved by this court: use of the cost of reproduction with an adjustment for depreciation . . . use of the original property cost less depreciation . . . and the capitalization of actual income approach . . . ." (Citations omitted.) *Uniroyal, Inc.* v. *Board of Tax Review*, supra, 386. "A property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and actual value. . . . The highest and best use conclusion necessarily affects the rest of the valuation process because, as the major

factor in determining the scope of the market for the property, it dictates which methods of valuation are applicable." (Internal quotation marks omitted.) *Aetna Life Ins. Co.* v. *Middletown,* supra, 35–36. Highest and best use has been defined as "the use that will most likely produce the highest market value, greatest financial return or the most profit from the use of a particular piece of real estate." (Emphasis omitted; internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor,* supra, 262 Conn. 25. As noted previously, both the plaintiff and the defendants agree that the highest and best use of the subject property as of October 1, 2004, was its continued use "as improved" as an oil and gas terminal. As different methods of valuation have been utilized by the opposing parties' appraisers the court is left to choose whether the comparable sales approach or the cost approach is the best method to establish the true and actual value of the property as of October 1, 2004, in accordance with the highest and best use. Once that choice is made, the court then must establish the true and actual value.

The comparable sales approach utilized by the plaintiff is also known as the market data approach or sales comparison approach. "It is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised. . . . After identifying comparable sales, the appraiser makes adjustments to the sales prices based on elements of comparison." (Internal quotation marks omitted.) *Abington, LLC* v. *Avon,* 101 Conn. App. 709, 711–12 n.4, 922 A.2d 1148 (2007), quoting *Sun Valley Camping Cooperative, Inc.* v. *Stafford,* 94 Conn. App. 696, 702 n.8, 894 A.2d 349 (2006). Under the cost approach, utilized by the town, "the appraiser estimates the current cost of replacing the subject property with adjustments for depreciation, the value of the underlying land and entrepreneurial profit.

. . . This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market." (Internal quotation marks omitted.) *Abington, LLC* v. *Avon*, supra, 712 n.4, quoting *Sun Valley Camping Cooperative, Inc.* v. *Stafford*, supra, 702 n.10.

The plaintiff has not utilized the cost approach because there has not been a large number of recently constructed projects to serve as a benchmark, and, thus, there is not a large body of data to analyze the costs of actual construction projects for petroleum storage facilities-terminals. Industry participants instead have chosen to purchase or lease existing facilities, which is cheaper than the cost to construct new facilities. New terminals are simply not being constructed.

On the other hand, the sales comparison approach reflects the activity of buyers and sellers in the marketplace. Although the court recognizes that the marketplace for petroleum storage and distribution tank farms is unique, the key is to find sufficient other properties of similar utility and desirability that have been sold and to adjust them to the subject property to arrive at a value for the subject property. The plaintiff's appraiser had a database of approximately 700 sales available for review and analysis in order to select appropriate comparable sales, indicating an active sales environment for this type of unique facility over the past ten to fifteen years. The plaintiff has utilized the details of the sales of five comparable properties located in Connecticut, New England and New Jersey and has made adjustments to arrive at the value of $6,104,000, rather the town's figure of $13,250,000.[8] Although the court will discuss further its position on the value of the subject property, the court finds that the sales comparison approach utilized by the plaintiff's appraiser was the proper method of valuation. In doing so, the

---

[8] See footnote 5.

court has taken into account the lack of experience of the town's appraiser in dealing with properties of this type. In choosing between the methods of valuation, and adopting the sales comparison approach, the court finds that the plaintiff's appraiser has significantly more experience in appraising petroleum storage facilities and finds his reasons for selecting the comparable sales comparison approach to be credible.

The plaintiff has submitted evidence of the sales of five facilities that occurred between July 19, 1993, and February 26, 2004, three of which were in Connecticut.[9] The remaining two sales involved facilities in South Portland, Maine, and Bayonne, New Jersey. Although the subject property consists of a land area of approximately 25.67 acres and a safe fill storage capacity of 813,880 barrels, the comparable sales ranged from as small as 11.95 acres and 462,497 barrels to land size as large as fifty-six acres or storage capacity of 2,136,165 barrels.

The first facility sale used by the plaintiff's appraiser in his sales comparison approach is located at 481 East Shore Parkway, New Haven. The date of sale was July 10, 1993, for a price of $15,400,000. The facility contains 37.98 acres and a tank capacity of 1,737,793 barrels. The building area contains 28,000 square feet. The parcel is described as a well maintained terminal able to accommodate 900 foot vessels and all barges. This facility is also the subject of a second sale on May 5, 2000, for a price of $13,535,000.[10] The price per barrel unit of value for the first sale was $8.86 per barrel and for the second sale was $7.95.[11]

---

[9] The facility located at 481 East Shore Parkway, New Haven, accounts for two of the five sales, having been sold first on July 10, 1993, and then again on May 5, 2000.

[10] The tank capacity at the time of the second sale is listed as 1,702,682 barrels.

[11] The unit price per barrel is arrived at by dividing the sales price by the tank storage barrel capacity.

The third sale is a facility located at 134 Forbes Avenue, New Haven, which was sold on June 15, 1997, for $3,100,000. The facility contains 11.95 acres and has a barrel capacity of 462,497 barrels. The building area contains 12,350 square feet. The facility has a river dock only on the Quinnipiac River and can handle barges only. It is described as a mid-size terminal that has been recently upgraded. The unit price per barrel was $6.70.

The fourth sale is a facility located at 1 Clark Street, South Portland, Maine.[12] The facility sold for $3,395,000 on May 16, 2001. The property contains twenty-seven acres,[13] and the building area is 12,550 square feet. The tank capacity is 503,000 barrels. It can handle deep water vessels, barge and rail traffic. Although the property is described as well maintained, it is noted that it will require upgrading to comply with Maine's department of environmental protection chapter 600 regulations. The unit price per barrel was $6.75.

The fifth sale is a facility located at the "foot of" East 5th Street and Avenue A in Bayonne, New Jersey. It was sold on February 26, 2004, for a price of $13,700,000. The land area contains 23.56 acres, and the building area is 13,875 square feet. The tank capacity is 2,136,165 barrels, and the facility can handle barges and deep water vessels. This facility is described as two separate terminals connected by a "jointly owned pipeline." The terminal did not have a usable ship dock and is described as being in fair to poor condition. The unit price per barrel was $6.41.

The plaintiff's subject facility, as noted, is located on Lordship Boulevard, Stratford. It contains 25.67 acres

[12] The plaintiff's appraisal copy incorrectly identifies the property as 175 Front Street, South Portland, Maine.

[13] The plaintiff's appraisal stated fifty-six acres, but at the time of his testimony, the witness Manzione conceded that the property may, in fact, consist of twenty-seven acres based on information contained in the assessor's records. The witness testified that this factor did not change his opinion as to the value of the facility.

and has a safe fill tank capacity of 813,880 barrels.[14] It is the plaintiff's position that the unit price per barrel is $7.50 for the subject property. Although the Bridgeport portion of the total facility contains a deep water barge and vessel dock, the Stratford portion of the facility does not have a dock such as this. As noted previously, the Bridgeport tax assessor, as of October 1, 2004, assessed the Bridgeport portion of the subject site at $8,867,479.

The plaintiff's appraiser has taken various factors into consideration in making the appropriate adjustments in value, given the disparities that exist among the five comparable sale facilities and the subject facility, and given the fact that the sales have occurred over a period of years. These factors as set forth in the appraisal copy are population centers, time, location,[15] capacity, supply sources, product spectrum, uninterrupted usage, tank condition and miscellaneous improvements such as truck loading racks, vapor recovery systems, vessel docks, offices and warehouses. It is noted that the Stratford portion of the plaintiff's facility does not include a truck loading rack, vapor recovery system, vessel dock, terminal office and warehouse buildings, as these are all located on the facility's Bridgeport portion and are not subject to taxation by the town.[16] The five comparable sales contain at least some of these items that the Stratford facility lacks. These adjustments have resulted in an "adjusted" unit price per barrel of $7.98 for parcel one, $7.15 for parcel two, $6.70 for parcel three, $6.75 for parcel four and $8.02 for parcel five. A value of $7.50 per barrel has been assigned to the subject property. If the court were to accept the town's assessed

---

[14] The tanks have a total capacity of 893,000 barrels.

[15] Proximity to highways, deep water access and the New York mercantile market area.

[16] The Stratford portion does include an older water treatment facility building, a masonry foam house, a guard kiosk and two small metal sheds.

value of $13,750,700, the unit price per barrel would be approximately $16.90, more than double the unit prices per barrel shown previously.

The court has reviewed the five comparable sales. Although they span a period of years, and each facility is different from the other, as well as different in some aspects from the subject parcel, the five properties give the court an educated view into how these types of petroleum storage facilities are valued and subsequently assessed. Although the evidence regarding the Bridgeport portion of the plaintiff's facility was not offered as a comparable sale, the court cannot ignore that with its deep water barge and vessel dock, truck loading rack, vapor recovery system, terminal office and warehouse buildings, the Bridgeport portion was assessed at $8,867,479 as of October 1, 2004. There is nothing to indicate that the subject parcel is more valuable than the Bridgeport portion of the plaintiff's facility.

V

CONCLUSION

The court is of the opinion that the unit price per barrel for the subject property is $8. The subject parcel has a safe fill capacity of 813,880 barrels. In applying the unit price per barrel to this safe fill capacity, the court finds that the true and actual proper fair market value for the subject property on October 1, 2004, is $6,510,400. The plaintiff has satisfied its burden of establishing overvaluation. In reaching this conclusion, the court has taken into account the subject facility's proximity to the New York mercantile market, the ability to serve a larger population, the access to highways and the access to a deep water dock at the Bridgeport portion of the plaintiff's facility. The assessment shall

be reduced on the grand lists for succeeding years until the value of the property has increased or decreased.